T. S. McSHANE Co., INC., APPELLEE, V. GREAT LAKES PIPE. LINE COMPANY, A CORPORATION, APPELLANT.

57 N. W. 2d 778

Filed April 10, 1953.   No. 33237.

*Smith & Smith,* for appellant.

*Finlayson, McKie & Kuhns,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

This is an action at law upon two contracts alleged to have been entered into by the defendant, Great Lakes Pipe Line Company, with the plaintiff, T. S. McShane Co., Inc., for the rental of a dragline and a clamshell bucket. The jury returned a verdict for $1,887.50 for rentals found to be due under the provisions of the dragline contract and for $222 for the rentals due under the clamshell-bucket contract. Judgment was entered for these amounts and the defendant appeals.

The evidence shows that the defendant undertook to extend and enlarge its pipe-line terminal in Omaha at an estimated cost of more than $2,000,000. The construction work was being performed by three prime contractors and subcontractors to whom portions of the work were sublet. The evidence also shows that all ordinary and usual construction materials were provided by the contractors. Certain technical equipment and materials, including pipe used in the construction of pipe lines, were provided by the defendant and stockpiled in its material yard at the terminal for use by contractors when needed. It was necessary when this material arrived that it be unloaded from freight or gondola cars into defendant's material yard. This unloading was handled by short-form contracts made from time to time by the defendant as the material arrived. The general construction headquarters of the defendant were in Kansas City, Missouri, from which point the

general direction and supervision of the Omaha project, and many others as well, were handled. One R. D. Williamson was supervisor of construction of stations and terminals, which designation included the Omaha project which is here involved. The record shows that Williamson directed and supervised the construction of the terminal at Omaha, insofar as the interests of the defendant were concerned, through a subordinate located at that point, who was designated as resident engineer. Prior to June 12, 1950, the resident engineer had no authority to contract on behalf of the defendant except upon approval by Williamson, or certain officers superior to him who were located in Kansas City. After June 12, 1950, the resident engineer was authorized to enter into contracts on behalf of the defendant without specific approval where the amount did not exceed $100.

The position of resident engineer on the Omaha terminal project was held by one W. J. Lank, Jr., from November 16, 1949, to September 8, 1950. He occupied a temporary building on the property and was the highest officer of the defendant on the ground insofar as construction was concerned. It was his duty to assist the contractors in the interpretation of plans and specifications and see to it that the construction work was performed in accordance therewith. He also entered into contracts for additional work resulting from changes in plans and specifications and for the unloading and handling of technical materials and pipe from railroad cars into defendant's material yard, ordinarily with approval by telephone or letter from Kansas City. For this purpose he was supplied with two forms of contract blanks, one a mimeographed form, the other a printed form bound together in lots of 50 and 100. When contracts involving $100 or less were required, Lank would execute the appropriate form contract with which he was supplied. If more than $100 was involved he could execute the contract only on approval from Kansas City, but the forms were left in his pos-

session in order that the proposed work could be promptly contracted without the necessity of sending them in to Kansas City for formal approval. It is important to note here that all construction work being performed on the Omaha terminal project was being done by contract with one exception. The defendant did employ from one to five men as the need required, to work in defendant's material yard to maintain materials and equipment there stockpiled, and to handle them in and out of the yard as the work progressed. At no time did the defendant own, rent, or purchase heavy construction equipment for its use on this project.

In the latter part of May 1950, Lank called Hugh M. Saxton, the manager of the contractor's equipment department of the plaintiff company, and inquired if his company had a dragline to rent. The conversation resulted in a meeting of the two at plaintiff's equipment yard the next morning. Terms of the rental were agreed upon and Saxton was requested to prepare the rental agreement and bring it to Lank's office where he said he would sign it on behalf of the defendant company. Under date of June 1, 1950, the agreement was executed, Lank signing as the authorized agent of the defendant company. The contract was made up on the forms used by the plaintiff company and it provided generally for the rental of the dragline for a minimum of 3 months for $943.75 per month. Purchase order agreements were made out on forms provided by the Great Lakes Pipe Line Company for each monthly payment as it became due. This was necessary, according to Lank, in order that a copy could be attached to the invoice for the monthly rental payment. While the rental contract provided for the payment of rentals in advance, plaintiff agreed to bill the defendant at the end of the month to meet the alleged requirements of the defendant company. All billings were sent to the Omaha post-office box of the defendant, which was under the control of Lank. No invoice was ever sent to the office at Kansas

City. The rental for June was paid on July 20, 1950, by a check drawn on the Valley Coal Company. No other payments were made on the dragline contract.

The evidence further shows that on or about June 1, 1950, the dragline was hauled by a carrying company from plaintiff's equipment yard to 18th and Vinton Streets in Omaha upon Lank's order. It was consigned to one Forst, a contractor, who used it in constructing a Safeway Store at 21st or 22nd and Vinton Streets under a rental agreement with Lank. A week or 10 days later it was used on 13th Street in loading trucks with dirt. A salesman for the plaintiff company, one John M. Fruhwirth, reported that 2 or 3 days after it left plaintiff's equipment yard the dragline was working at the Safeway Store site. Some days later Saxton saw it working on the 13th Street job. Saxton inquired of Lank why the dragline was working so far from the terminal and was told that, because of plaintiff's delay in getting the dragline serviced for use, he had lost the dirt he intended to use and had to come to 13th Street to get the dirt for the fill to be made in the terminal area. No further inquiry was made of anyone concerning the use of the dragline, or the authority of Lank to make the rental agreement. There is evidence that Forst later obtained contracts on the terminal project and used the dragline there. He received his pay, for the use of the dragline in this work, from the defendant in the ordinary manner. Saxton and other employees of the plaintiff saw the dragline working at the terminal during this period. They testified that they had no knowledge that the dragline had been rented to Forst by Lank. On September 8, 1950, Williamson discovered the nature of the transactions made by Lank with the plaintiff. Plaintiff was immediately notified and the employment of Lank terminated. Plaintiff repossessed its dragline from a dredging contractor at Plattsmouth, Nebraska, to whom it had been leased by Lank.

In the latter part of June 1950, Lank made inquiry of the plaintiff concerning the rental of a clamshell bucket. This resulted in a written contract under date of July 1, 1950, on the forms used by the plaintiff for the rental of a clamshell bucket at the rate of $111 per month. Lank signed the contract as the purported authorized agent of the defendant. The monthly rental of the clamshell bucket was thereafter included in the purchase order agreements made each month upon the forms provided Lank by the defendant company. The situation thereafter was no different as to the clamshell-bucket contract than that existing as to the dragline agreement.

We think the record clearly shows that Lank did not have actual authority to enter into the two contracts involved in this action. The primary question for determination is whether or not Lank had implied, apparent, or ostensible authority to execute the contracts and bind the defendant in so doing. The question of agency and the authority of an agent to bind his principal is ordinarily a question of fact. Unless there is no evidence in the record to warrant the submission of this issue to a jury, the verdict must be sustained. In other words, the question before us is whether or not the trial court erred in failing to direct a verdict for the defendant at the close of plaintiff's evidence and at the close of all the evidence, or in failing to sustain the motion for judgment notwithstanding the verdict after the verdict was returned.

We think the controlling rule is correctly stated in Johnston v. Milwaukee & Wyoming Inv. Co., 46 Neb. 480, 64 N. W. 1100, as follows: "That where a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform on behalf of his principal a particular act, such particular act having been performed, the principal is estopped, as against such innocent third

person, from denying the agent's authority to perform it. We do not think that in order to bring a case within this principle it is in all cases necessary to show that by general custom, as defined in the former opinion of the court, such agents have such authority; nor do we think that it is necessary in all cases to show that the same agent had previously performed similar acts; that such acts were known to the principal; that the third person also knew of them, and relied on them in the transaction, or even that similar agents had in the past performed such acts. A number of elements may influence the solution of the question." See, also, Nebraska Tractor & Equipment Co. v. Great Lakes Pipe Line Co., *ante* p. 366, 56 N. W. 2d 288, and the authorities therein cited.

It is clear from this record that Lank had no actual authority to execute the contracts in question. As resident engineer he was an agent of the defendant company with certain duties to perform. All of the construction work at the terminal was being performed by contractors. Lank was the agent of the owner charged with the duty of checking the work being done against the plans and specifications, making progress reports to the Kansas City office, and the making of contracts for extra work not covered by the prime contracts when authorized by his superior officers in the Kansas City office. He was not a superintendent in charge of construction charged with the duty of completing the project as quickly and expeditiously as possible. We fail to find any satisfactory evidence in the record that a resident engineer charged with such duties is empowered by custom and usage to make contracts for equipment for use in the construction of a project. Custom or usage in a trade or business may be shown in establishing the apparent or ostensible authority of an agent only when it is known by the party sought to be charged thereby, or when it is so well settled and so uniformly acted upon as to create a reasonable presumption that it

was known to both contracting parties and that they contracted with reference to it. Milwaukee & Wyoming Inv. Co. v. Johnston, 35 Neb. 554, 53 N. W. 475. We cannot say that the evidence is sufficient to support a finding that Lank was authorized by usage and custom as above defined to make the contracts in question.

The evidence does not show that the defendant ever authorized approval or acquiesced in the performance of similar acts on the part of Lank. Not a single instance has been pointed out where Lank had purchased, rented, or used heavy construction equipment at the instance of or in the furtherance of the work of the defendant. The fact was that defendant was a common carrier of petroleum products by pipe line. All of the construction work at the Omaha terminal was performed by contractors and no deviation from this policy on the part of the defendant has been shown. Consequently it cannot be said that plaintiff relied upon previous acts of a similar nature performed by Lank which were approved or acquiesced in by the defendant. It follows that apparent or ostensible authority was not created by knowledge on the part of the plaintiff that Lank had been permitted to perform similar acts in the past which were sufficient to estop defendant from denying his authority to act.

The controlling rule, however, does not require that apparent or ostensible authority be grounded on custom and usage or the performance of similar acts by the agent in the past in order to establish apparent or ostensible authority. The nature of the business, usages peculiar to the business, or the natural necessities inherent in the duties of the agent, might create an apparent or ostensible authority upon which those dealing with the agent might safely rely. But we find no such circumstances here from which a jury could properly infer that Lank was clothed with apparent or ostensible authority to sign the contracts in question. It is evident that plaintiff and its officers assumed that Lank

had authority to bind the defendant. Their failure to make inquiry of anyone other than Lank concerning the use of the dragline and clamshell bucket at points distant from defendant's terminal, their failure to bill the defendant other than through Lank, and their failure to take note of the fact that the first and only payment was made by a concern other than the defendant, gives credence to the statement that they were lulled into such a sense of security by Lank that they threw all caution to the winds. The negligence of the plaintiff in not knowing or discovering the extent of Lank's authority is so great and the evidence of any conduct on the part of the defendant which could be construed as an estoppel to deny his authority is so lacking that a finding for the plaintiff cannot stand. The fact that form contract blanks used by the defendant were left with Lank for use when authorized is not proof of apparent or ostensible authority to enter into contracts generally. The possession of form contract blanks is not evidence of the extent of the authority of an agent, although it is a circumstance that might be considered in some cases. The evidence is not sufficient to sustain a verdict and a verdict for the defendant should have been directed. The judgment of the district court is reversed and the cause remanded with directions to enter a judgment notwithstanding the verdict for the defendant.

REVERSED AND REMANDED WITH DIRECTIONS.