DOLORES MCCURRY, PERSONAL REPRESENTATIVE OF THE ESTATE OF DANETTE ROBIN MCCURRY, DECEASED, APPELLANT, V. SCHOOL DISTRICT OF VALLEY, A POLITICAL SUBDIVISION, APPELLEE.

496 N.W.2d 433

Filed February 26, 1993.    No. S-89-1480.

Daniel G. Dolan for appellant.

Thomas A. Otepka and Susan E. Norris, of Gross & Welch, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

In this suit joining an action for the wrongful death of Danette Robin McCurry with an action on behalf of said decedent's estate, the personal representative of the estate and mother of the decedent, the plaintiff-appellant, Dolores McCurry, challenges the district court's grant of summary judgment to the defendant-appellee, School District of Valley. In so doing, the personal representative asserts, in summary, that the district court erred in (1) refusing her leave to amend her petition, (2) determining there were no genuine issues of material fact, and (3) treating the settlement agreement she had reached with another as relevant to her suit against the school district. We affirm.

## II. FACTS

The school district arranged a 1988 ski trip for its students, as had been done since 1970. School district officials planned to depart on the evening of February 12, ski on the slopes of Winter Park, Colorado, and return in the early morning hours of February 16.

Depending on the number of students wishing to participate and the resulting cost, the school district planned to either charter a bus or rent or use school vans for transportation. Because of the level of interest shown in the trip, it became necessary to charter a bus and to arrange for additional transportation.

In December 1987 or January 1988, while at a nonschool function, school district teacher Bob Harper remarked to Scott Nielsen, a local resident but not a school district employee, that there were more students than there was room on the chartered bus. Nielsen told Harper to contact him if he needed help with the ski trip. Approximately 1 week later, Harper called Nielsen

and asked him to drive his (Nielsen's) van on the trip, which Nielsen agreed to do without wage or salary. However, the school district was to pay for Nielsen's gas and lodging, and he was to cover his own expenses for food and skiing.

Albeit unknown to the school district, for it did not inquire as to Nielsen's driving record, Nielsen was a licensed motor vehicle operator whose license had not been suspended at any time.

Two days before the trip, Nielsen decided to take his daughter along to visit her aunt in Denver, and he obtained authorization from Harper to do so.

While school district employees did not tell Nielsen what route to take nor what stops to make, he had no control over who was to be riding in his van. Instead, Harper assigned who would ride in Nielsen's van, and Nielsen was informed on the evening of February 12 who his passengers would be.

Nielsen and Harper agreed that it would be best if Nielsen's van departed at approximately 7 p.m., or 2 hours ahead of the bus, thus allowing the van to make stops, whereas the bus would drive straight through, except for stops to change drivers. Nielsen estimated that the 600-mile trip would take 12 to 13 hours. The van and the bus were to meet at the slopes in Winter Park at approximately 8:30 the next morning.

Nielsen worked during the day of February 12 at his job with the Omaha Public Power District. After leaving work early, at "[a] little after 4:00," he arrived home at 4:30 p.m. and immediately went to bed. He awakened at 6:45 p.m.

With Nielsen driving, the van departed from the school gymnasium in Valley, Nebraska, on February 12. Whether the van left around 7 p.m. or sometime after 8 p.m. is in dispute.

Nancy Berg, a home economics teacher, and her family were expected to ride in the van with Nielsen. However, they instead rode on the bus after a group of students approached Harper and asked permission to ride in the van. Riding in Berg's place was Bill Leggitt, who had expressed interest in riding in the van because his daughter was one of the passengers.

Including Nielsen, nine individuals occupied the van, notwithstanding that it was designed to seat only eight occupants; there were thus not enough seat belts for all the occupants. Neither Nielsen nor Leggitt instructed the students

to use seat belts.

Nielsen had driven to the Colorado ski areas "many times," an estimated 10 to 12 times previously. However, he had not been to Winter Park before, and this was his first trip transporting students.

Nielsen set the cruise control at 55 miles per hour. After leaving a rest area near Lexington, Nebraska, Nielsen slowed down to 50 miles per hour because the wind was "blowing real hard" and he had observed slick spots on the road surface. The wind velocity was corroborated by Leggitt. Nielsen stated that he drove in the inside lane because it appeared to be drier and traffic was lighter. However, Leggitt stated that he did not recall Nielsen driving in the inside lane. Moreover, Leggitt stated that Nielsen was sitting on one of his legs while driving, thereby relying on the cruise control for acceleration.

Nielsen had the van's radio on and was conversing with Leggitt, who did not expect to share in the driving responsibilities because he was "anticipating sleeping as much as [he] could on the way to Winter Park." However, Leggitt denies telling Nielsen that he did not wish to drive. Nielsen, on the other hand, claims that Leggitt told him at one point that he (Leggitt) did not wish to drive. This surprised Nielsen somewhat, for he assumed one of Leggitt's functions was to assist with the driving. Nielsen decided that if he became drowsy, he would ask Leggitt to drive "whether he wanted to or not." At least one trip organizer also assumed that Leggitt would share the driving responsibility. In past trips, the vans each had two drivers "for the safety of the kids."

Approximately 4 miles east of Brady, Lincoln County, Nebraska, on Interstate 80, the van was involved in a single-vehicle accident. Nielsen stated how the accident occurred:

> Just after going under an overpass heading west there was a curve in the road, which curved to the left, a gradual curve. And right at the end of the curve it was like somebody just took their hand and pushed the whole van to the side. The van went down into the median right to the side.

As the cruise control was still engaged, Nielsen immediately

tapped his brakes to disengage it. According to Nielsen, the van was traveling at 50 miles per hour at the time of the accident. However, Trooper Dan Kuhn stated that according to his notes from a postaccident interview with Nielsen, Nielsen stated that he was traveling at 60 miles per hour.

While traveling through the median, Nielsen steered to the left to miss a turnaround road. In an attempt to avoid a culvert and to stop, Nielsen steered the van up onto the eastbound lane. The van rolled over and landed on the passenger side.

What happened next is in dispute. Nielsen claims that it was he who pushed the front windshield out of the van and helped the students exit. However, Leggitt, who has been a friend of the McCurry family since 1981 and whose daughter was a good friend of the decedent, states that it was he who pushed out the windshield.

It was after counting heads outside the van that the group became aware that the decedent was missing. She was found lying outside the van partially pinned under it.

Nielsen stated that he did not know why the van left the road. He told Kuhn that it "must have been ice or could have been ice." One of the student passengers told a school district teacher who helped organize the trip that she had been listening to Nielsen and Leggitt conversing when the van began swerving. However, Leggitt stated that he was asleep until awakened by a "lurch" and a "screech."

Trooper Dana Korell investigated the accident and found no ice on the Interstate and stated that the wind "was not blowing to speak of." No skid marks or tire marks were found in the westbound lanes, nor were skid marks found in the median. Korell and Kuhn thought that Nielsen fell asleep while driving the van. However, Nielsen was not given a traffic citation.

The personal representative alleged that the school district "negligently entrust[ed] the transportation" of the decedent to Nielsen and that the school district, through its agent Nielsen, was negligent in the operation of the van.

Although the suit originally named Nielsen as a party defendant, he and the personal representative later, on January 30, 1989, entered into an agreement labeled a *"COVENANT NOT TO SUE,"* which, in relevant part, recites that in

consideration of the payment of $95,000 by Nielsen, the personal representative "covenant[s] not to sue" him for any claims arising out of the subject accident. Moreover, the "compromise agreement" states that the personal representative knew Nielsen was "not paying" the "full amount of damages as would be paid if all persons, including the [school district] were settling said action . . . ." The agreement concludes by declaring that the instrument "is a covenant not to sue . . . and is not a release."

## III. ANALYSIS

### 1. DENIAL OF LEAVE TO AMEND

The personal representative first urges that the district court erred in refusing to grant her leave to amend her petition. In this connection, the record tells us only that on the day the school district's motion for summary judgment was submitted, the personal representative moved to "allege a new allegation of negligence" and that the motion was overruled because the motion for summary judgment had been taken under advisement.

Amendment of a petition is not a matter of right. *Omaha Nat. Bank v. Koliopoulos*, 204 Neb. 752, 285 N.W.2d 496 (1979). Rather, the decision to grant or deny an amendment to a pleading rests in the discretion of the trial court. *Nebraska Equal Opp. Comm. v. State Emp. Retirement Sys.*, 238 Neb. 470, 471 N.W.2d 398 (1991). In the absence of some mitigating factor which would justify the raising of new issues by a party after a motion for summary judgment has been heard and submitted, it is not an abuse of discretion to deny a motion to amend pleadings. *Yunghans v. O'Toole*, 199 Neb. 317, 258 N.W.2d 810 (1977).

The record shows no mitigating factor to justify an amendment to the pleadings after the motion for summary judgment had been submitted. Therefore, we cannot say the district court abused its discretion in denying the motion to amend the petition.

Nonetheless, the personal representative argues that what she meant by alleging that the school district negligently entrusted the decedent's transportation to Nielsen is that the

school district failed "to select a safe plan of transportation" for her. While it is not necessary to state a cause of action in any particular form, *Waite v. Samson Dev. Co.*, 217 Neb. 403, 348 N.W.2d 883 (1984), and in actions not involving extraordinary remedies, general pleadings are to be liberally construed in favor of the pleader, *Hutmacher v. City of Mead*, 230 Neb. 78, 430 N.W.2d 276 (1988), proper pleading nonetheless requires a petition to state in logical and legal form the facts which constitute the cause of action, define the issues to which the defendant must respond at trial, and inform the court of the real matter in dispute, *Rosnick v. Marks*, 218 Neb. 499, 357 N.W.2d 186 (1984), and Neb. Rev. Stat. § 25-804 (Reissue 1989). It is the facts well pleaded, not the theory of recovery or legal conclusions, which state a cause of action. *Moore v. Puget Sound Plywood*, 214 Neb. 14, 332 N.W.2d 212 (1983).

Pleading the conclusion that the school district negligently entrusted the decedent's transportation to Nielsen, without more, simply does not do what is required of a petition. As a consequence, the petition fails to state a negligent entrustment cause of action, whatever that cryptic phrase may have been intended to mean in the context of this case.

We have recently held that when it is asserted in a motion for summary judgment that an opposing party has failed to state a cause of action, the motion may be treated, as far as that issue is concerned, as one for judgment on the pleadings. *Ruwe v. Farmers Mut. United Ins. Co.*, 238 Neb. 67, 469 N.W.2d 129 (1991). But see *Naidoo v. Union Pacific Railroad*, 224 Neb. 853, 402 N.W.2d 653 (1987) (affirming grant of summary judgment on ground petition failed to state cause of action). Applying the rule announced in *Ruwe*, it follows that the district court correctly entered judgment on the pleadings in favor of the school district on the issue of the nature of the transportation it provided to the decedent.

### 2. ISSUES OF FACT

Thus, the success of the personal representative in this appeal rests on the viability of her claim that the school district, through Nielsen as its agent, negligently operated the van in which the decedent was riding. It is appropriate to recall at this

juncture that summary judgment is properly granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record show there is no genuine issue concerning any material fact or the ultimate inferences deducible from such fact or facts and the movant is entitled to judgment as a matter of law. *Jaramillo v. Mercury Ins. Co., ante* p. 223, 494 N.W.2d 335 (1993); *Howard v. Blue Cross Blue Shield, ante* p. 150, 494 N.W.2d 99 (1993).

There can be no question that whether Nielsen drove in a negligent manner presents genuine issues of material facts with respect to whether he failed to keep a proper lookout or to maintain reasonable control over his vehicle, as the personal representative pled. That circumstance, however, avails the personal representative nothing unless Nielsen's negligence, should the trier of fact determine such to have existed, is imputable to the school district.

Whereas under the respondeat superior doctrine the negligence of an agent is imputable to the principal, unless the person engaging the services of an independent contractor failed to exercise due care in selecting the contractor, or unless the duty to be performed is nondelegable, the negligence of the contractor is not imputable to the person engaging the contractor. See *Greening v. School Dist. of Millard*, 223 Neb. 729, 393 N.W.2d 51 (1986). Thus, it becomes important to determine Nielsen's status vis-a-vis the school district. An agent is a person authorized by the principal to act on the principal's behalf and under the principal's control. See *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990). An independent contractor is one who, in the course of an independent occupation or employment, undertakes work subject to the will or control of the person for whom the work is done only as to the result of the work and not as to the methods or means used. *Wausau Ins. Co. v. Schake*, 220 Neb. 802, 373 N.W.2d 669 (1985).

The determination of whether one is an independent contractor or an agent is one of fact. See, *Plock v. Crossroads Joint Venture*, 239 Neb. 211, 475 N.W.2d 105 (1991); *Professional Recruiters v. Wilkinson Mfg. Co.*, 222 Neb. 351, 383 N.W.2d 770 (1986); *T. S. McShane Co. v. Great Lakes Pipe*

*Line Co.*, 156 Neb. 766, 57 N.W.2d 778 (1953). The common-law test for determining whether an independent contractor status exists includes the consideration and weighing of many factors, no one of which is conclusive. *Eden v. Spaulding*, 218 Neb. 799, 359 N.W.2d 758 (1984). See, also, *Professional Recruiters v. Wilkinson Mfg. Co., supra.* The criteria for making the determination include a consideration of who has the right of control, who provided the tools, the degree of supervision exerted over the one performing the work, the method of payment, and the contractual understanding between the parties. *Professional Recruiters v. Wilkinson Mfg. Co., supra; Rudolf v. Tombstone Pizza Corp.*, 214 Neb. 276, 333 N.W.2d 673 (1983); *Maricle v. Spiegel*, 213 Neb. 223, 329 N.W.2d 80 (1983).

Moreover, whether an agency relationship exists between two parties depends on the facts underlying the association, irrespective of how the parties describe or characterize their connection. See *Gottsch v. Bank of Stapleton, supra.* Moreover, an agency may be implied from the words and conduct of the parties and the circumstances of the particular case evidencing an intention to create the relationship. *Saffer v. Saffer*, 133 Neb. 528, 274 N.W. 479 (1937), *overruled on other grounds, Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985).

Here, Nielsen was asked by a school employee to drive; notwithstanding that Nielsen was driving his daughter for a purpose of her own, the trip also furthered the interests of the school district; although Nielsen was not told what route to take, how many, if any, stops to make, nor the speed at which he was to drive, he was given a destination and an approximate departure and arrival time; except for the presence of his daughter, he had no control over who rode in his van; and while he was not being paid wages or a salary to drive, certain of his expenses were being defrayed by the school district.

Under such circumstances, reasonable minds could differ as to whether Nielsen was an agent of the school district. Thus, unless the settlement agreement with Nielsen forecloses the personal representative from pursuing her action against the school district, the grant of summary judgment would have

been improvident.

### 3. EFFECT OF SETTLEMENT AGREEMENT

Thus, we reach the third and final assignment of error, in which the personal representative asserts that the district court erred in considering the settlement she had effected with Nielsen.

### (a) Historical Background

Although this case does not involve joint tortfeasors, a review of the rules applicable to settlements with such is helpful to an understanding of the rule to be applied in the situation here presented. The traditional common-law rule provided that the release of one joint tortfeasor was a complete surrender of any cause of action against any other joint tortfeasor and a bar to any suit against the other without regard to the sufficiency of the consideration actually received or the intent of the parties. The basis for this rule was the ancient theory of unity of the injury and the fact that the injured party is entitled to only one compensation, thus making it impossible for the injured party to release one tortfeasor without discharging the other. Annot., 24 A.L.R.4th 547 (1983).

This court first adopted the traditional rule in *Neligh v. Bradford*, 1 Neb. 451 (1871). However, 40 years later, in *Fitzgerald v. Union Stock Yards Co.*, 89 Neb. 393, 131 N.W. 612 (1911), this court held that settlement with one of several joint wrongdoers and payment of damages is not a defense to an action against another unless it is agreed that the settlement was full compensation for damages suffered. See, also, *Hauth v. Sambo*, 100 Neb. 160, 158 N.W. 1036 (1916).

As we shall see, the giving of a release is but one means of effecting a settlement. Consequently, the traditional rule with regard to joint tortfeasors has not been without its detractors. The *Fitzgerald* court insightfully noted that

[i]f some of the wrongdoers are willing to adjust the matter by paying their reasonable proportion of the damage done, and the injured party can accept such payment and still reserve his claim against the more stubborn ones, such a construction of the law would seem to facilitate settlement and tend to avoid litigation.

*Fitzgerald*, 89 Neb. at 400, 131 N.W. at 614.

As one venerable commentator has observed:

> This result has been justly condemned because it compels the plaintiff either to forego any opportunity of obtaining what it is possible to get from one defendant without suit, or to give up the entire claim against the other without full compensation. . . . A surrender of one therefore should not on any reasonable basis discharge the other, except to the extent that there has been full compensation.

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 49 at 333 (5th ed. 1984).

Currently, the standard for determining the effect of an agreement purporting to operate as a "release" under Nebraska law is controlled by two factors: (1) whether the injured party has received full satisfaction and (2) whether the parties intended that the release be in full satisfaction of the injured party's claim. *Scheideler v. Elias*, 209 Neb. 601, 309 N.W.2d 67 (1981) (apparently adopting Restatement (Second) of Torts § 885 (1979), held that where successive, rather than joint, tortfeasors are involved, release of the tortfeasor responsible for the original injury does not, absent a showing of intent to the contrary, preclude action against the provider of subsequent medical treatment for the injury).

### (b) Release Distinguished from Covenant Not to Sue

Some courts began to recognize the covenant not to sue as a means of limiting the application of the traditional rule. Other jurisdictions opted for modification or abrogation of the traditional rule by way of statute. At least 19 states repudiated the common-law rule and its deleterious effect upon unsuspecting plaintiffs by enacting some version of the Uniform Contribution Among Tortfeasors Act (UCATA). Unif. Contribution Among Tortfeasors Act § 1, 12 U.L.A. 63 (1975). Nebraska is not among the states adopting that act. But see Neb. Rev. Stat. § 25-21,185.11 (Cum. Supp. 1992), which became effective February 8, 1992, and affects the operation of certain releases, covenants not to sue, and similar agreements.

Apparently because the distinction between the two types of

instruments was not considered important to the resolution of the case then at hand, we have, on more than one occasion, referred to releases and covenants not to sue as if they were the same. See, e.g., *Pioneer Animal Clinic v. Garry*, 231 Neb. 349, 436 N.W.2d 184 (1989); *Mayer v. Howard*, 220 Neb. 328, 370 N.W.2d 93 (1985); *Roy v. Morford*, 216 Neb. 818, 346 N.W.2d 392 (1984); *Stetina v. State Farm Mut. Auto. Ins. Co.*, 196 Neb. 441, 243 N.W.2d 341 (1976). But cf. *Scheideler v. Elias, supra,* which distinguishes between the two.

The genesis of our equivocal treatment of these two very different instruments can be traced to *Dickey v. Meier*, 188 Neb. 420, 197 N.W.2d 385 (1972). There, we said, "Where the doctrine of respondeat superior has been involved, many cases make no distinction between releases and covenants not to sue." *Id*. at 423, 197 N.W.2d at 387. Leaving aside for the moment how the doctrine of respondeat superior affects the operation of releases and covenants not to sue, it is clear that the two devices are not the same.

As the Nevada Supreme Court noted in *Van Cleave v. Gamboni Constr.*, 99 Nev. 544, 665 P.2d 250 (1983), "A 'release' extinguishes the cause of action as to all joint tortfeasors. On the other hand, a 'covenant not to sue' does not extinguish the cause of action and does not release other joint tortfeasors even if it does not specifically reserve rights against them." *Id*. at 547, 665 P.2d at 252, citing *Whittlesea v. Farmer*, 86 Nev. 347, 469 P.2d 57 (1970).

> " ' "A covenant not to sue is not a release, but it is to be distinguished from a release, and the distinction, although technical or artificial, is clear. The difference is one of *intent and grows out of the construction placed on the* terms of the instrument, since a covenant not to sue is not a present abandonment or relinquishment of a right or claim but merely an agreement not to enforce an existing cause of action, and, although it may operate as a release between the parties to the agreements, it will not release a claim against joint obligors or joint tortfeasors." ...' "

*Crim v. Jones*, 204 Ga. App. 289, 291, 419 S.E.2d 130, 131 (1992), quoting *Ga. R. Bank &c. Co. v. Griffith*, 176 Ga. App. 198, 335 S.E.2d 417 (1985). For other sources distinguishing the

effect of a release from that of a covenant not to sue in either the joint tortfeasor or master-servant context, see, e.g., *Fetz v. E & L Truck Rental Co.*, 670 F. Supp. 261 (S.D. Ind. 1987) (applying Indiana law); *Hall v. Schulte*, 836 P.2d 989 (Ariz. App. 1992); *Cox v. Pearl Invest. Co.*, 168 Colo. 67, 450 P.2d 60 (1969); *Brunswick Corp. v. Concorde Yachts, Inc.*, 370 So. 2d 102 (Fla. App. 1979); *Brown v. Timpte Inc.*, 137 Ill. App. 3d 1053, 485 N.E.2d 488 (1985); *Menzel v. Morse*, 362 N.W.2d 465 (Iowa 1985); *Cullen v. Atchison, T. & S. F. Rly. Co.*, 211 Kan. 368, 507 P.2d 353 (1973); *Lincoln v Gupta*, 142 Mich. App. 615, 370 N.W.2d 312 (1985); *Colton v. New York Hospital*, 53 A.D.2d 588, 385 N.Y.S.2d 65 (1976); *Waden v. McGhee*, 274 N.C. 174, 161 S.E.2d 542 (1968); *Levi v. Montgomery*, 120 N.W.2d 383 (N.D. 1963); *Imark Industries v. Arthur Young & Co.*, 148 Wis. 2d 605, 436 N.W.2d 311 (1989); Restatement (Second) of Contracts § 285(1) (1981); Restatement (Second) of Torts § 885 (1979).

However, at least one source of commentary views the distinction between releases and covenants not to sue as artificial, obscuring what in the commentator's view should be the real issue: the intent of the parties.

> The only desirable rule would seem to be that a plaintiff should never be deprived of a cause of action against any wrongdoer when the plaintiff has neither intentionally surrendered the cause of action nor received substantially full compensation. If the statutes are taken into account, this is now the rule actually applied in most American jurisdictions. Where there has been such full satisfaction, or where it is agreed that the amount paid under the release is so received, no claim should remain as to any other tortfeasor; but these are questions of fact, and normally to be determined by the jury, where the amount of the claim is unliquidated. The release, however, may very well be taken as a prima facie acknowledgment of satisfaction, and the burden placed upon the plaintiff to prove that it is not.

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 49 at 335 (5th ed. 1984).

Indeed, the U.S. Supreme Court has expressed its preference

for determining the effect of a release or covenant not to sue in accordance with the intention of the parties. In the antitrust case of *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 347, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971), *reh'g denied* 401 U.S. 1015, 91 S. Ct. 1247, 28 L. Ed. 2d 552, the Court, citing Restatement (Second) of Torts § 885 (Tentative Draft No. 16, 1970), held that "[t]he straightforward rule is that a party releases only those other parties whom he intends to release."

### (c) As Applied to Principal and Agent

This jurisdiction has applied a distinctive rule to torts committed in the principal-agent context. In *Dickey v. Meier*, 188 Neb. 420, 197 N.W.2d 385 (1972), the plaintiff was injured when an employee-agent of the employer-principal backed a truck into another vehicle, pinning the plaintiff between the vehicles. Following the accident, both the employer-principal and the employee-agent died. The plaintiff filed claims against the estates of both. While the cases were pending on appeal to the district court, the plaintiff and employee-agent's estate executed for a consideration a " 'special and restricted release and indemnifying agreement.' " *Id*. at 421, 197 N.W.2d at 386. The agreement specifically reserved any and all claims the plaintiff might have against the employer-principal.

Citing *Fitzgerald v. Union Stock Yards Co.*, 89 Neb. 393, 131 N.W. 612 (1911), Restatement of Torts § 885(1) (1939), and Restatement (Second) of Torts § 885 (Tentative Draft No. 16, 1970), the plaintiff in *Dickey* argued that the employee-agent and employer-principal were joint tortfeasors, and in such a situation release and discharge of one of such tortfeasors was not a defense to an action against the other unless it was agreed between the parties to the settlement that such payment was in full satisfaction of all damages suffered.

However, the *Dickey* court distinguished the situation therein presented from that presented in *Fitzgerald, supra*, on the basis that "[the employee-agent] and [employer-principal] were not joint tort-feasors under the facts" in *Dickey* because "the liability of the employer-principal arises only by virtue of the doctrine of respondeat superior, and not through any independent negligence of the employer-principal." *Dickey* at

423, 197 N.W.2d at 387. Although noting that "[c]ourts generally have not made this distinction or have followed rules applicable to true joint tort-feasors even though recognizing the distinction," *id.*, citing Annot., 92 A.L.R.2d 533 (1963), the *Dickey* court declared that "in a tort action based exclusively on the alleged negligence of an employee or agent, a valid release of that employee-agent releases the employer or principal from liability, even though the release specifically reserves all claims against the employer-principal." *Dickey* at 424, 197 N.W.2d at 388, citing Annot., 20 A.L.R.2d 1044 (1951); *Bacon v. United States*, 321 F.2d 880 (8th Cir. 1963) (applying Missouri law); *Max v. Spaeth*, 349 S.W.2d 1 (Mo. 1961).

Thus, the *Dickey* court distinguished between settlements involving joint tortfeasors and those involving vicarious liability arising out of the respondeat superior doctrine. We have since maintained this distinction. See, *Wicker v. City of Ord*, 233 Neb. 705, 447 N.W.2d 628 (1989); *Pioneer Animal Clinic v. Garry*, 231 Neb. 349, 436 N.W.2d 184 (1989); *Mallette v. Taylor & Martin, Inc.*, 225 Neb. 385, 406 N.W.2d 107 (1987); *Ericksen v. Pearson*, 211 Neb. 466, 319 N.W.2d 76 (1982). See, also, *Plock v. Crossroads Joint Venture*, 239 Neb. 211, 475 N.W.2d 105 (1991).

This state has not been alone in its adherence to the rule that a covenant not to sue the agent operates to release the principal from liability. See, e.g., *Copeland v. Humana of Kentucky, Inc.*, 769 S.W.2d 67 (Ky. App. 1989); *Horejsi by Anton v. Anderson*, 353 N.W.2d 316 (N.D. 1984) (interpreting version of UCATA); *Mid-Continent Pipeline Co. v. Crauthers*, 267 P.2d 568 (Okla. 1954); *Craven v. Lawson*, 534 S.W.2d 653 (Tenn. 1976) (interpreting version of UCATA). See, also, *Atkinson v. Wichita Clinic, P.A.*, 243 Kan. 705, 763 P.2d 1085 (1988).

Cogent reasons, perhaps expressed best by the Supreme Court of Utah in *Holmstead v. Abbott G.M. Diesel, Inc.*, 27 Utah 2d 109, 493 P.2d 625 (1972), exist for continuing to do so. The plaintiff in *Holmstead* brought suit against the employer, alleging that its employee, while operating his motor vehicle within the scope of employment, negligently collided with plaintiff's vehicle. The employee procured a covenant not to sue from plaintiff. The employer moved for summary judgment on

the ground that the plaintiff's covenant not to sue the employee operated to release the employer from liability. The trial court denied the motion.

On appeal, the Supreme Court of Utah held that the covenant not to sue the employee exonerated the employer from liability. In so doing, it stated that were it to hold otherwise,

> the covenant not to sue would be wholly abortive of its intended object and purpose if it went no further than to protect the employee against a direct action by the injured party but afforded no protection against an action over by his employer. If the covenant be so narrowly construed, the payment made as consideration would constitute no more than a credit on the amount which the injured person might ultimately recover under a judgment, and the employee would remain liable for the remainder.

*Holmstead*, 27 Utah 2d at 114, 493 P.2d at 628.

Notwithstanding that the rule enunciated in *Holmstead* was superseded when Utah adopted a version of the UCATA, *Krukiewicz v. Draper*, 725 P.2d 1349 (Utah 1986), we find wisdom in the reasoning of the *Holmstead* court.

In so writing, we are not unmindful that in at least two cases, *Mallette v. Taylor & Martin, Inc., supra*, and *Ericksen v. Pearson, supra*, we quoted with seeming approval an antipodal statement found in 76 C.J.S. *Release* § 50 (1952). According to that source of commentary, the purpose of the rule that settlement with the agent constitutes settlement with the principal is that "if the rule were otherwise, [the principal] would be liable without having recourse against the [agent] primarily liable, the latter having been released . . . ." *Id*. at 689.

As support for the quoted statement, C.J.S. cites *Hillyer v. City of East Cleveland*, 94 N.E.2d 216 (Ohio App. 1950), a decision of the Ohio Court of Appeals. Therein, the plaintiff sued the city for injuries she sustained when she fell as the result of a defective sidewalk known by the city to be such. The Court of Appeals, relying on the premise that the city was primarily liable and the abutting property owner secondarily liable, held that the plaintiff's acceptance of payment from the abutting property owner in partial satisfaction of her claim entitled the

city to a pro tanto satisfaction of its liability. In distinguishing the situation then before it from those in which the abutting property owner, rather than the city, had primary liability, the Court of Appeals opined that in the latter situation, the release of the property owner as the party primarily liable would defeat the "right of the city to be subrogated to the rights of the injured party and to recover over its loss from the property owner." *Id.* at 219. Whatever significance the Ohio Court of Appeals' dictum may have had under the law of Ohio, it does not alter our view of the reasoning used by the *Holmstead* court. Moreover, the ruling of the Court of Appeals was reversed by the Supreme Court of Ohio in *Hillyer v. E. Cleveland*, 155 Ohio St. 552, 99 N.E.2d 772 (1951), which determined that as the sidewalk on which the plaintiff fell was constructed for the property owner, it was the owner who was primarily liable and the city which was secondarily liable, and that having settled with the property owner, the plaintiff was barred from recovering from the city. The Supreme Court did not comment on the reason the Court of Appeals gave for the rule with which we are concerned.

Thus, at least until we are called upon to consider the impact, if any, of § 25-21,185.11 upon the situation, we reaffirm that in the principal-agent setting, it matters not how the settlement was reached; whether by release or covenant not to sue, settlement with the agent constitutes a settlement with the principal, no matter what the parties may have intended.

## IV. JUDGMENT

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

CAPORALE, J., participating on briefs.

SHANAHAN, J., dissenting.

Early in its opinion, the majority, with its judicial pencil, strokes a line between a "release" and a "covenant not to sue," and then, without explanation or hesitation, turns the pencil around and erases that distinctive line. As a consequence, a release and a covenant not to sue become inseparable, indistinguishable, and, therefore, identical as an agreement for settlement of a tort claim. Because I believe that a covenant not

to sue is essentially different from a release and that settlement through a covenant not to sue an agent does not discharge the principal from liability for the same harm involving the agent, I dissent.

Scott Nielsen; his wife, Cynthia Nielsen; and Nielsens' insurance company, State Farm Mutual Automobile Liability Insurance Company, entered into an agreement with Dolores McCurry, personal representative of the estate of Danette Robin McCurry, which was titled *"COVENANT NOT TO SUE."* The agreement provided that in exchange for $95,000, the McCurry estate "covenant[s] not to sue" Scott Nielsen, Cynthia Nielsen, and State Farm "for any and all liability, actions, causes of action, claims, demands known or unknown, upon or by reason of any damage, loss or injury . . . sustained by the [McCurry estate]" concerning the automobile accident which caused the death of Danette Robin McCurry.

The covenant also stated that

> the undersigned [personal representative] knowing that the Settling Parties [Nielsens and State Farm] are not paying the total of the undersigned's full amount of damages as would be paid if all persons, including the School District of Valley (hereinafter "Valley") were settling said action or cause of action and all claims for damages of the undersigned herein, does hereby credit and satisfy that portion of the total amount of damages that the undersigned has suffered and will suffer because of the aforesaid accident which has been caused by the negligence, if any, of . . . the Settling Parties . . . it being the act and intention of the undersigned to covenant not to sue, and the undersigned does hereby so covenant for that fraction and portion and percentage of the total cause of action and claim for damages against all parties . . . for which any or all of the Settling Parties hereto are found to be liable and responsible . . . and the undersigned does hereby reserve, save, maintain and preserve against other parties the balance of the whole cause of action of the undersigned against said other parties, which balance of said cause of action is not released hereunder.

Additionally, the McCurry estate's settlement agreement

contained a provision to indemnify Nielsens and State Farm:

> In further consideration of the aforesaid payment to the [McCurry estate] by the Settling Parties hereto for the damages, injuries and claims of the undersigned, the [McCurry estate] hereby indemnifies and agrees to indemnify and save harmless the said Settling Parties and State Farm, their agents, employees, successors, assigns and insurers, for a sum up to and not to exceed $95,000.00 that they will or may be required to pay upon any judgment obtained against them by a joint tortfeasor or any other party to said action or any other party for contribution in any way arising out of any damages . . . resulting from said accident . . . .

The settlement agreement or covenant not to sue, signed by the personal representative, concludes with the following: "It is understood and agreed by the parties that this instrument is a covenant not to sue as to the above-mentioned parties and is not a release."

As characterized by one commentator, a release is "a surrender of the cause of action" and a covenant not to sue is an agreement "by which the plaintiff does not surrender the cause of action, but merely agrees not to enforce it." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 49 at 332, 334 (5th ed. 1984). Similarly, according to the Michigan Supreme Court:

> "A covenant not to sue is to be distinguished from a release in that it is not a present abandonment or relinquishment of the right or claim but is merely an agreement not to sue on an existing claim. It does not extinguish the cause of action. As between the parties to the agreement, the final result is the same in both cases. The difference is primarily in the effect as to third parties, and is based mainly on the fact that in the case of a release there is an immediate release or discharge, whereas in the other case there is merely an agreement not to prosecute a suit."

*Theophelis v Lansing Hospital*, 430 Mich. 473, 492 n.14, 424 N.W.2d 478, 486 n.14 (1988) (quoting from 66 Am. Jur. 2d *Release* § 2 (1973)).

This court has said that "in a tort action based exclusively on the alleged negligence of an employee or agent, a valid *release* of that employee-agent releases the employer or principal from liability, even though the *release* specifically reserves all claims against the employer-principal." (Emphasis supplied.) *Dickey v. Meier*, 188 Neb. 420, 424, 197 N.W.2d 385, 388 (1972). Accord, *Plock v. Crossroads Joint Venture*, 239 Neb. 211, 475 N.W.2d 105 (1991); *Wicker v. City of Ord*, 233 Neb. 705, 447 N.W.2d 628 (1989); *Pioneer Animal Clinic v. Garry*, 231 Neb. 349, 436 N.W.2d 184 (1989); *Mallette v. Taylor & Martin, Inc.*, 225 Neb. 385, 406 N.W.2d 107 (1987); *Ericksen v. Pearson*, 211 Neb. 466, 319 N.W.2d 76 (1982). The rule expressed in *Dickey* is based on the rationale that a principal's liability under the doctrine of respondeat superior is secondary to or derived from and dependent on the agent's liability for a harm. Therefore, if the agent is released from liability, a legal link in the chain of the principal's liability is broken, and the principal is discharged from liability for the harm originating with the agent.

Logic requires a different rule and result when a covenant not to sue is utilized for settlement of claims arising out of the principal-agent relationship. If a plaintiff covenants not to sue an agent, but does not release the agent from liability, the link in the chain of liability is not broken; hence, the principal's derivative liability is left intact. Many courts have applied the foregoing rationale in holding that a covenant not to sue an agent does not discharge the principal from liability; for instance, see, *Atkinson v. Wichita Clinic, P.A.*, 243 Kan. 705, 763 P.2d 1085 (1988); *Dworak v. Olson Const.*, 191 Colo. 161, 551 P.2d 198 (1976); *Holve v. Draper*, 95 Idaho 193, 505 P.2d 1265 (1973); *Lincoln v Gupta*, 142 Mich. App. 615, 370 N.W.2d 312 (1985); *Bartrand v C & O R Co*, 87 Mich. App. 466, 274 N.W.2d 822 (1978); *Thomas v Checker Cab Co*, 66 Mich. App. 152, 238 N.W.2d 558 (1975); *Centala v Navrude*, 45 Mich. App. 282, 206 N.W.2d 544 (1973); and *Henry B. Steeg and Associates v. Rynearson*, 241 N.E.2d 888 (Ind. App. 1968).

Other courts have held that a covenant not to sue an agent will not discharge a principal from liability so long as the parties to the settlement agreement intend to preserve an action against the principal. An illustrative decision is *Stewart v. Village of*

*Summit*, 114 Ill. 2d 23, 499 N.E.2d 450 (1986), wherein the Supreme Court of Illinois held that a covenant not to sue an agent, without the express reservation of the right to sue other parties, discharges the agent's principal, but a covenant not to sue which reserves the right to prosecute a claim against others who are not parties to the settlement agreement does not discharge the principal from liability. The court said in *Stewart*:

> [I]t [is] clear that the claim against an employer, although based on *respondeat superior*, if reserved, survives the covenant not to sue. This is consistent with the long-established rule that the agreement is the controlling factor and the governing fact to be determined is the intent of the parties. [Citations omitted.]
>
> We conclude that the parties intended that plaintiff's right to sue all persons or entities other than [the employee] survive the execution of the covenant, and in allowing defendant's motion for summary judgment, the circuit court erred.

(Emphasis in original.) 114 Ill. 2d at 30, 499 N.E.2d at 453. Accord, *Hall v. Schulte*, 836 P.2d 989 (Ariz. App. 1992); *Ledesma v. Cannonball, Inc.*, 182 Ill. App. 3d 718, 538 N.E.2d 655 (1989); *Ray Korte Chevrolet v. Simmons*, 117 Ariz. 202, 571 P.2d 699 (Ariz. App. 1977); *Hovatter v. Shell Oil Company*, 111 Ariz. 325, 529 P.2d 224 (1974).

To prevent a double recovery, whatever payment has been received for the plaintiff's covenant not to sue may be applied to reduce pro tanto an eventual recovery against any defendant determined to be liable for the plaintiff's injury. See, *Cullen v. Atchison, T. & S. F. Rly. Co.*, 211 Kan. 368, 507 P.2d 353 (1973); *Whittlesea v. Farmer*, 86 Nev. 347, 469 P.2d 57 (1970); *Henry B. Steeg and Associates v. Rynearson, supra*.

Under current Nebraska common law, when a principal is free from active wrongdoing but is vicariously liable for injuries caused by the principal's agent, the principal has an action against the agent for indemnification of the principal's loss. See *Warner v. Reagan Buick*, 240 Neb. 668, 483 N.W.2d 764 (1992) (indemnity is available to one free from wrongdoing whose liability was vicariously imposed). See, also, *City of Wood River v. Geer-Melkus Constr. Co.*, 233 Neb. 179, 444 N.W.2d

305 (1989). Looking to the possibility of indemnification from an agent, the majority places much stock in *Holmstead v. Abbott G. M. Diesel, Inc.*, 27 Utah 2d 109, 493 P.2d 625 (1972), in which the Supreme Court of Utah held that a covenant not to sue an employee released the employer because, without the effective release, the employee might be subjected to the employer's suit for indemnification notwithstanding that the employee, as a recipient of a covenant not to sue, had intended to obtain protection from all liability arising out of the incident in which the plaintiff-covenantor was injured.

However, in McCurry's case, the parties to the covenant not to sue expressly and very definitely acknowledged the possibility of an indemnificatory action by the School District of Valley. The covenant not to sue contained a specific provision for the McCurry estate's indemnification of Nielsens and State Farm to the extent of $95,000 payable on any judgment against Nielsens and State Farm as the result of the auto accident which caused the death of Danette Robin McCurry. Consequently, the concerns and rationale expressed in *Holmstead* are irrelevant to McCurry's case. Also, this court's majority loses sight of the fact that the covenant not to sue, as a settlement agreement, is between the McCurry estate, Nielsens, and State Farm. The School District of Valley is not a party to that agreement. Whatever may have been their motivation, Nielsens and State Farm accepted the covenant not to sue as a means to compromise and settle the tort claim by the McCurry estate. Scott Nielsen's exposure to possible indemnification, dependent on a future judgment for the McCurry estate against the School District of Valley, supplies no legal basis to bar the estate's action against the school district.

Returning to the *Holmstead* decision, it is fortunate that the Utah Legislature recognized and eliminated the inequity of the *Holmstead* rule by enacting Utah Code Ann. § 78-27-42 of the Utah comparative negligence act in 1973, legislation that, in its effect, is quite similar to Neb. Rev. Stat. § 25-21,185.11(1) (Cum. Supp. 1992), which states:

>  (1) A release, covenant not to sue, or similar agreement entered into by a claimant and a person liable shall discharge that person from all liability to the claimant but

shall not discharge any other persons liable upon the same claim unless it so provides. The claim of the claimant against other persons shall be reduced by the amount of the released person's share of the obligation as determined by the trier of fact.

Even a cursory examination of the covenant not to sue involved in the McCurry case discloses that none of the parties contemplated that the School District of Valley would be released from liability as a consequence of the settlement agreement. No matter how many times one reads the covenant not to sue, the settlement agreement remains a clear expression that the McCurry estate would not sue Nielsens or State Farm. Through the McCurry estate's expressly reserving rights against the School District of Valley, the settlement agreement shows on its face that the covenant not to sue was never intended to release the school district from liability. In the final analysis, the settlement agreement between the McCurry estate, Nielsens, and State Farm is the only evidence of intent concerning the covenant not to sue and, as an unambiguous expression, must be construed in accordance with the parties' manifest intent as shown by the language of the settlement agreement. Moreover, the majority acknowledges that the difference between a release and a covenant not to sue is the intent underlying the settlement agreement and, to support that distinction, quotes from *Crim v. Jones*, 204 Ga. App. 289, 291, 419 S.E.2d 130, 131 (1992), which stated: " ' " 'The difference [between a release and a covenant not to sue] is one of intent and grows out of the construction placed on the terms of the instrument . . . .' " ' " Later, the majority approves of the Prosser and Keeton insight that the real issue is the intent of the parties, that is, "a plaintiff should never be deprived of a cause of action against any wrongdoer when the plaintiff has neither intentionally surrendered the cause of action nor received substantially full compensation." Keeton et al., *supra*, § 49 at 335.

Finally, the majority mouths the standard expressed by the U.S. Supreme Court in *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 347, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971), which stated: "The straightforward rule is that a party releases only those other parties whom he intends to release."

Yet, in infinite irony, the majority concludes: "[I]t matters not how the settlement was reached; whether by release or covenant not to sue, settlement with the agent constitutes a settlement with the principal, no matter what the parties may have intended." So much for *intent* as an important and determinative factor in ascertaining whether a settlement agreement is actually a release.

Until this court construes § 25-21,185.11(1) to change the unjust and absolutely inequitable result in McCurry's case, today's decision will undoubtedly have a dramatic and undesirable impact on tort litigation based on vicarious liability. Tort claims involving a principal and agent will have to proceed to resolution through a trial, lest a covenant not to sue, as a settlement agreement with an agent, terminate any issue of a principal's liability. Severely curtailing settlements is hardly a sound and steady step toward practical resolution of disputes.

In summary, there is no showing that the covenant not to sue, as a settlement agreement, was intended to discharge the School District of Valley from liability for the death of Danette Robin McCurry. Rather, the settlement agreement between the McCurry estate, Nielsens, and State Farm is permeated with the intent that the covenant not to sue discharged only Nielsens and State Farm from liability for the death of Danette Robin McCurry and that the estate reserved its right to proceed against the School District of Valley. The majority concedes that a fact question exists concerning Scott Nielsen's agency relationship with the School District of Valley, that is, "unless the settlement agreement with Nielsen forecloses the personal representative from pursuing her action against the school district, the grant of summary judgment would have been improvident." The summary judgment against the McCurry estate was not only "improvident," but downright wrong. Since the summary judgment is incorrect as a matter of law, this court should have reversed the summary judgment and remanded this cause to the district court for further proceedings.