Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/26/2025 09:07 AM CDT

MEGHAN KONECNE, PERSONAL REPRESENTATIVE OF
THE ESTATE OF HOWARD MISLE, APPELLEE, V.
ABRAM, LLC, A NEBRASKA LIMITED
LIABILITY COMPANY, APPELLANT.

___ N.W.3d ___

Filed September 26, 2025.    No. S-24-122.

1. **Summary Judgment: Appeal and Error.** An appellate court reviews
   rulings on a motion for summary judgment de novo, viewing the record
   in the light most favorable to the nonmoving party and drawing all
   reasonable inferences in that party's favor.
2. **Limitations of Actions: Appeal and Error.** The point at which a stat-
   ute of limitations begins to run is a factual question to be determined
   from the facts of each case, and, in an action at law, the decision
   of the fact finder will not be set aside by an appellate court unless
   clearly wrong.
3. **Recoupment.** Recoupment is, in effect, a defense of reduction.
4. ____. Recoupment is merely defensive in that it does not seek an affir-
   mative judgment in the action.
5. ____. Recoupment is an affirmative defense.
6. **Limitations of Actions: Recoupment.** The defense of recoupment is
   not barred by a statute of limitations.
7. ____: ____. The defense of recoupment must arise out of the same
   transaction or occurrence as the plaintiff's cause of action, and it sur-
   vives as long as the plaintiff's cause of action exists, even if affirma-
   tive legal action upon the subject of recoupment is barred by the statute
   of limitations.
8. **Claims: Recoupment: Words and Phrases.** The "same transaction"
   inquiry concerns whether the parties' claims arise from the same trans-
   action between the parties.
9. **Limitations of Actions.** When the discovery rule is applicable, the run-
   ning of the statute of limitations is tolled until the discovery of the cause
   of action.

10. **Limitations of Actions: Words and Phrases.** "Discovery of a cause of action" occurs when there is knowledge of facts constituting the basis of the cause of action or awareness of the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry, which, if pursued, would lead to the discovery of the cause of action.

11. **Limitations of Actions: Notice.** The question as to a plaintiff's knowledge of the facts which should have put a person of ordinary intelligence and prudence on notice is a question of fact.

12. **Principal and Agent: Words and Phrases.** An "agent" is a person authorized by the principal to act on the principal's behalf and under the principal's control.

13. **Principal and Agent.** As a general rule, the knowledge of an agent is imputed to his principal.

14. ____. Generally, whether an agency relationship exists and the scope of an agent's authority present questions of fact.

15. **Judgments: Appeal and Error.** In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.

16. **Corporations: Stock.** As a general rule, two separate corporations are regarded as distinct legal entities even if the stock of one is owned wholly or partly by the other.

17. **Principal and Agent: Notice.** Notice of facts will be imputed only to the principal for whom and in whose interest an agent acted at the time.

18. **Actions: Parties: Time.** Plaintiffs, including cross-plaintiffs, are bound by their knowledge as to specific facts occurring in specific timeframes.

19. **Actions.** Discovery does not occur until there is at least an awareness of the existence of specific facts, which, if pursued, would have led to the discovery of the specific cause of action.

20. **Principal and Agent: Notice.** Notice to the agent is notice to the principal only when the agent is acting within the scope of its authority, and an agent's powers may be limited or restricted.

21. **Principal and Agent: Corporations.** In the case of an officer or agent of a private corporation dealing with its funds, the authority of such officer or agent is not known to all but depends upon the authority conferred upon him by the corporation which he represents.

22. **Limitations of Actions: Fraud.** Under Neb. Rev. Stat. § 25-207(4) (Reissue 2016), the statute of limitations is not tolled. Instead, the accrual of the cause of action does not occur until the fraud is discovered.

23. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party assigning the error.

Appeal from the District Court for Lancaster County: KEVIN R. McMANAMAN, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Sara A. Pernicek and Lawrence K. Sheehan, of Ellick, Jones, Buelt, Blazek & Longo, L.L.P., for appellant.

Robert S. Sherrets, of Sherrets, Bruno & Vogt, L.L.C., for appellee.

FUNKE, C.J., CASSEL, STACY, PAPIK, and FREUDENBERG, JJ.

FREUDENBERG, J.

## I. INTRODUCTION

This appeal arises out of an action commenced by Howard Misle (Howard) against Abram, LLC, on a promissory note. While the action was pending below, it was revived in the name of the personal representative of Howard's estate, which, in the interest of clarity, we also refer to as "Howard." At issue on appeal is the availability of Abram's affirmative defense of recoupment based on a purported 2007 overpayment on the note, the tolling of the statute of limitations on Abram's counterclaims related to that overpayment, and the district court's adoption of Howard's calculation of interest on the note.

The district court granted summary judgment in favor of Howard on the issue of recoupment, concluding that the 2007 payment for which Abram sought recoupment was from a separate transaction; thus, any credit due was not recoverable. Later, after a trial on the limited issue of Howard's statute of limitations defense to Abram's counterclaims, the court concluded that the statute of limitations on Abram's counterclaims had run and was not tolled. The court ordered Howard

to provide an interest calculation on the stipulated amount due on the note and subsequently adopted Howard's interest calculation without holding an evidentiary hearing or trial on the issue. Thereafter, the court denied Abram's objection to the calculation, concluding that the amount of interest was only "a math question," and entered judgment in favor of Howard. As detailed below, we affirm in part, and in part reverse and remand for further proceedings.

## II. BACKGROUND

### 1. Misle Family and Entity Structure

The factual scenario underpinning this action flows from the death of Howard's father, Abram Misle. Abram Misle was survived by his wife, Helen Misle, and their four children: Howard, Linda Shrier (Linda), Marsha Misle-Haugland (Marsha), and Gayle Misle (collectively the family). In accordance with Abram Misle's will, a trust (Misle Trust) was established for the benefit of Helen Misle in late 2003.

The trust was funded with 100 percent of the shares of O Street Development Company (O Street Development), which was the sole member of Abram. Abram owned a single mortgaged property, which we refer to as "Park Place." Helen Misle was the president of O Street Development, while Marsha was the trustee of the Misle Trust and the manager of Abram. The Misle Trust, O Street Development, and Abram, as well as Helen Misle and Marsha personally, were clients of the same accountant.

### 2. Abram Business

#### (a) Early Years (2003 to 2005)

In 2003, due to the loss of Park Place's tenant, Abram was unable to make its mortgage payments. To meet Abram's obligations, the family individually contributed various amounts of personal funds. By the end of 2003 or early 2004, Howard was the only family member contributing funds to Abram.

As a result, in 2004, Howard, as lender, and Abram, as borrower, executed a promissory note with a $500,000 line of credit "at the [interest] rate of three percent (3%) per annum," payable on demand. The promissory note was secured by a deed of trust for Park Place. Due to continued payments by Howard, in 2005, the promissory note was modified to extend the line of credit to $5 million. At that time, Marsha resigned as manager of Abram and Howard became the manager.

### (b) Howard and Sale of Park Place (2005 to 2007)

From 2005 to 2007, Abram's expenses were paid solely by Howard's advances on the note. Due to Abram's state of affairs, in 2007, Howard, in his role as manager of Abram, decided to sell Park Place. Under Abram's operating agreement, the manager had full unilateral authority to sell and purchase real property and the manager had no obligation to provide any information to O Street Properties or the Misle Trust. Still, Howard discussed his plan to sell the property with the family, and no one in the family objected.

Abram closed on a sale of Park Place in February 2007. Howard was unable to attend the closing, so he provided the accountant limited power of attorney for the day of closing the sale. The funds from the sale were used in part to pay off the current balance on the promissory note, reimburse the family for its various contributions, and satisfy other debts.

Relevant to this appeal, the accountant was involved in coordinating the activities with the title company to complete the sale of Park Place and with Howard regarding any needed signatures. The accountant was instructed by Howard to pay the balance on the promissory note, with 9 percent interest. Howard provided the accountant with information concerning the amount of the advances made on the note and never provided the accountant with a copy of the note. Howard also instructed the accountant to separately reimburse him for the advances he had made to Helen Misle on behalf of Abram.

The seller's statement indicates, and the parties do not dispute, that Howard received two relevant sums itemized as (1) "Payoff Howard['s] lien" and (2) "Reimburse Howard['s] advance to Helen Misle." After the closing, the accountant drafted a separate "seller's statement," because "[s]ometimes, settlement statements that come from a title company can be confusing" and the accountant wanted "to make it as simple as [he] could" and "concisely put on one page." This document indicates the same two sums paid to Howard and also notes that the lien payoff included "interest at 9%." The accountant maintained a copy of this document in his client files at his firm.

### (c) Howard and Pennsylvania Properties (2008 to 2010)

Abram's remaining share of the proceeds from the sale of Park Place was reinvested through a "1031 exchange."[1] The 1031 exchange required a replacement property to be identified within 45 days of the sale, and the purchase of the replacement property needed to close within 6 months.[2]

As for identifying a replacement property, Howard's original plan was to purchase a discount store "in Scottsdale," which was "very lucrative" and "was going to have good cash flow in a very prosperous area." However, "[o]n the 44th day of the 45-day replacement period," Howard chose to forgo purchasing the discount store and, instead, purchased three strip malls in Pennsylvania (Pennsylvania properties) that his friend had found. Howard instructed the accountant "generally" not to tell anyone about the transaction. In the end, Abram owned two of the strip malls and the newly formed Misle Properties, LLC, owned the third one. Nothing concerning Misle Properties is at issue in this appeal.

---

[1] See I.R.C. § 1031 (2018).

[2] See *id.*

After acquiring the Pennsylvania properties, Howard hired his friend as property manager. However, by all accounts, that decision was a poor one, as the Pennsylvania properties quickly "were in bad financial shape." In addition to the friend's purported mismanagement, the Pennsylvania properties suffered a loss of tenants due to the "2007, 2008 . . . recessionary environment." Due to the lack of revenue generation, the Pennsylvania properties were operating at a loss, and in July 2008, Howard began making more advances to Abram on the promissory note.

In 2010, Howard resigned as manager of Abram, and Linda replaced him. However, Howard continued to advance Abram money on the promissory note.

### (d) Linda and Pennsylvania
### Properties (2010 to 2016)

With Abram in a failing financial condition, Linda began managing the Pennsylvania properties. Linda focused on reorganizing the strip malls, finding tenants, and recovering unpaid rents. When Linda took over as manager of Abram, she received only "a real thin little folder" of documents regarding the management of the Pennsylvania properties. She proceeded to receive copies of the leases from the accountant and worked with someone at his accounting firm to "recreate" business files on the properties.

In 2010, the family considered filing a lawsuit against Howard's friend for his mismanagement of the Pennsylvania properties. There was also discussion somewhere between 2010 and 2013 by Marsha, Linda, and the accountant as to whether to file a lawsuit against Howard for his decision to invest in the Pennsylvania properties instead of the discount store "in Scottsdale." Ultimately, it was decided that no lawsuit would be filed and that instead, Abram's focus and efforts would be placed on making the Pennsylvania properties profitable. No discussion was ever had about the possibility of filing suit against Howard concerning the sale of Park Place.

In 2014, Misle Properties, owner of the third strip mall, declared bankruptcy. A complete refinancing of the Pennsylvania properties for both Misle Properties and Abram was completed in 2016. The bankruptcy and subsequent refinancing were handled by Marsha. Howard continued to make advances to Abram on the promissory note until the Pennsylvania properties became profitable in 2016.

### 3. Abram's "Discovery" of Overpayment

In 2018 and 2019, Gayle Misle's relationships with Marsha and Linda soured for undisclosed reasons. Gayle Misle filed suit against Linda and Marsha, wherein she alleged various breaches of their duties to the Misle Trust concerning the acquisition and management of the Pennsylvania properties. As a result of the discovery in Gayle Misle's lawsuit, Abram received copies of (1) the 2004 promissory note between Howard and Abram and (2) the 2007 "seller's statement" prepared by the accountant after the sale of Park Place.

In the instant action, Abram asserted that it was not until the receipt of these two documents that Abram became aware of Howard's alleged misdeeds related to the sale of Park Place, giving rise to its affirmative defense of recoupment and its counterclaims in this case.

### 4. Instant Action

#### (a) Pleadings and Stipulations

Howard made a written demand for full repayment of the promissory note in January 2020. Payment was not made by Abram, and Howard instituted the instant action for repayment of the amount due, plus interest.

Abram disputed the total amount due on the note. Abram asserted that it was entitled to recoupment because in closing the sale of Park Place, Howard was paid (1) more than what "his records" showed was the amount of advanced funds between 2003 and 2007; (2) 9 percent interest instead of 3 percent as called for by the note; (3) for four mortgage

payments made by Helen Misle, not Howard; and (4) for a personal loan he made to Helen Misle, not Abram. Applying the same reasoning, Abram also asserted two counterclaims: breach of fiduciary duty and fraudulent concealment.

Eventually, the parties stipulated that the promissory note required Abram to pay the principal amount of all advances made on the note plus 3 percent interest. The parties also stipulated to the total amount advanced by Howard and the total amount repaid by Abram from 2008 to 2016.

### (b) Summary Judgment Proceedings

In the summary judgment order applicable to this appeal, the district court granted Howard's related motion in part. The court's resolutions of two issues are relevant on appeal.

First is the court's conclusion that, in light of the parties' stipulations, there was no genuine dispute as to the outstanding principal balance on the note subject to (1) a determination on the validity of Abram's counterclaims and (2) a calculation of the interest owed to Howard on the unpaid principal balance. Due to the parties' stipulations, the court also found that no dispute of material fact existed that the series of advances and payments between 2008 and 2016 were made on the promissory note and amended promissory note and that Howard was entitled to interest under the note. The court "expressly reserve[d]" the calculation of interest "to take place at a later date."

Second, the court granted summary judgment in Howard's favor on Abram's defense of recoupment. Quoting *Qualsett v. Abrahams*,[3] the court concluded that the defense failed as a matter of law because recoupment "would only be applicable if Abram 'has a claim for damages against [Howard] arising out of the **very same transaction** from which [Howard] seeks to recover.'" It noted that Howard's claim on the promissory note "arises out of the 21 advances he made to

---

[3] *Qualsett v. Abrahams*, 23 Neb. App. 958, 879 N.W.3d 392 (2016).

Abram," starting in July 2008, and, relying on opinions of the U.S. Courts of Appeals for the Third and Eighth Circuits,[4] reasoned that "[t]he mere fact that there was an ongoing contractual relationship [was] insufficient to meet the same transaction requirement of recoupment." The court concluded that Abram's defense of recoupment did not satisfy the same transaction test for the defense of recoupment because Abram sought to recover money from transactions separate and distinct "both in time and purpose" from the claim Howard sought to recover on.

### (c) Statute of Limitations Trial

The district court bifurcated the remaining trial issues and held a bench trial on the limited issue of Howard's affirmative defense that the statute of limitations had run on Abram's counterclaims for breach of fiduciary duty and fraudulent concealment.[5] At trial, three witnesses testified in support of Abram: Linda, Marsha, and Abram's accountant. The trial evidence showed the facts and circumstances of Abram's activities from 2003 to 2019 as set forth above.

The parties did not dispute that Abram's counterclaims accrued upon the disbursement of funds to Howard from the sale of Park Place in 2007. However, Abram contended that the running of the statute of limitations was tolled under the discovery rule, due to Howard's alleged fraudulent concealment, or both. In response, Howard argued that the three witnesses—Linda, Marsha, and Abram's accountant—were agents of Abram and that the limitations period was not tolled because they each had knowledge of or were on inquiry of Abram's claims, they did not exercise due diligence to discover them, and Howard did not conceal any facts that prevented them from discovering the claims.

---

[4] See, *U.S. on behalf of Postal Serv. v. Dewey Freight*, 31 F.3d 620 (8th Cir. 1994); *In re University Medical Center*, 973 F.2d 1065 (3d Cir. 1992).

[5] See Neb. Rev. Stat. § 25-221 (Reissue 2016).

In its judgment, the court first determined that the statute of limitations was not tolled by the discovery rule. The court found that Abram's three witnesses—Marsha as trustee of the Misle Trust, Linda as manager of Abram, and Abram's accountant—were agents of Abram and were on notice or had knowledge of Abram's claims against Howard.

Relevant to this appeal, the court found that Linda and Marsha were on notice and Abram's accountant had actual knowledge of the claims. Specifically, Marsha was "aware of the financial problems facing the Pennsylvania [p]roperties as early as 2010" and considered suing Howard over his purchase of the Pennsylvania properties. "This means, Abram considered suing Howard over the very same transaction as the underlying sale [of Park Place]." The court concluded that it was unreasonable for Marsha, as trustee, to fail to review the records related to the sale of Park Place and the 1031 exchange for the Pennsylvania properties—Abram's "one transaction." Similarly, Linda was on notice because her consideration of filing a lawsuit against Howard "reveal[ed] she was on notice of an issue related to Howard's management of Abram." Finally, Abram's accountant had "clear and complete knowledge" of the amounts Howard was paid from the sale of Park Place, and that "knowledge is fully and completely imputed onto Abram." Thus, the court reasoned, it was impossible to toll the statute of limitations under the discovery rule.

Turning to Abram's claim of fraudulent concealment, the court found that the statute of limitations was not tolled because Abram did not adduce evidence that showed Howard fraudulently concealed any information or established that it had exercised due diligence. It reasoned that the seller's statement was in the accountant's possession, and both Marsha and Linda had access to it, and that Howard's instruction to the accountant not to tell any of the family members details about the 1031 exchange was a "much more general"

statement so that Howard's decisions would not be second-guessed. In sum:

> Abram, and its' [sic] agents, had knowledge of the sale and knowledge that Howard was getting reimbursed as a part of the sale. Linda testified that to "uncover Abram's claim," she merely had to "look" at the [seller's statement]. The same document that was in [the accountant's] files the entire time.

With Abram's counterclaims resolved, the court ordered Howard to submit an "interest calculation and a draft final order on its claim" for the balance on the promissory note.

### (d) Interest Calculation and Objection

In accordance with the court's order, Howard submitted an interest calculation. Abram filed an objection to Howard's interest calculation. Abram asserted that the amount of interest was still in dispute, particularly the correct rate of interest— whether it was compound or simple interest. Abram also took issue with the imposition of interest because Linda was not aware of the promissory note when she was manager of Abram and Howard never discussed the issue of interest with her.

Howard resisted Abram's objection. Citing the court's prior summary judgment order and the parties' prior stipulation, he argued that the court had previously determined that all of the advances were pursuant to the promissory note and, therefore, were subject to 3 percent interest. Conversely, Abram contended that the court's prior summary judgment order, wherein it "expressly reserve[ed]" the calculation of interest "to take place at a later date," left the correct calculation of interest in dispute.

The court overruled Abram's objection. In doing so, the court noted that it had previously found that the amounts owed were subject to a 3-percent interest rate. The court adopted Howard's interest calculation and entered judgment in favor of Howard.

Abram timely appealed, and we moved this appeal to our docket on our own motion.[6]

## III. ASSIGNMENTS OF ERROR

Abram assigns, restated, that the district court erred in finding that (1) there was no genuine issue of fact and granting summary judgment in Howard's favor on its affirmative defense of recoupment and (2) the statute of limitations related to Abram's counterclaims was not tolled. Abram also assigns that the court erred (3) by not having a trial regarding the issue of interest and (4) in its adopted calculation of interest.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews rulings on a motion for summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[7]

[2] The point at which a statute of limitations begins to run is a factual question to be determined from the facts of each case, and, in an action at law, the decision of the fact finder will not be set aside by an appellate court unless clearly wrong.[8]

## V. ANALYSIS

### 1. Defense of Recoupment

Abram first challenges the district court's granting of summary judgment in Howard's favor on its defense of recoupment. Specifically, it contends that the court erred in concluding that

---

[6] See, Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2024); Neb. Ct. R. App. P. § 2-102(C) (rev. 2022).

[7] *Galloway v. Husker Auto Group*, 318 Neb. 178, 14 N.W.3d 218 (2024); *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024).

[8] See, *Zook v. Zook*, 312 Neb. 128, 978 N.W.2d 156 (2022); *Guinn v. Murray*, 286 Neb. 584, 837 N.W.2d 805 (2013); *Vrbsky v. Arendt*, 119 Neb. 443, 229 N.W. 337 (1930).

the payments to Howard upon the sale of Park Place constituted a separate transaction. By contrast, Howard responds that the loans at issue in this case were made between 2008 and 2016, whereas the loans made between 2003 and 2007 were "on a completely separate loan," which was "finalized" by the payment from Abram after the sale of Park Place.[9] We agree in part with both parties. Before setting forth our reasoning, it is first prudent to review both the development and the legal principles of recoupment.

### (a) Development of Recoupment

Recoupment, originally called recouper, is an ancient legal concept that dates back to at least the reign of Henry VIII.[10] Under early common law, all actions and suits were confined to the single subject of the litigation.[11] In the interest of judicial economy and to address the resulting narrow remedies and harsh results, courts of equity began to recognize recoupment, setoff, and, later, cross-demands and counterclaims.[12] Many of these principles were also made available in courts of law and adopted by statute.[13]

As a leading 19th-century treatise observed, the defense of recoupment is a creature of common law whereby "the defendant was entitled to show that the plaintiff had not sustained damages to the extent alleged, and thus to reduce, or altogether

---

[9] Brief for appellee at 16.

[10] See, generally, Theodore Sedgwick, Treatise on the Measure of Damages, ch. XVII (4th ed. 1868); Thomas W. Waterman, Treatise on the Law of Set-Off, Recoupment, and Counter-Claim, ch. X, § 417 (1869); Charles E. Clark, Handbook of the Law of Code Pleading, ch. 10 (1928).

[11] *Id*.

[12] *Id.*

[13] *Id.*

to defeat, the plaintiff's recovery."[14] The defendant's right of recoupment was "in the earlier period of the law, of very limited application."[15] As another treatise succinctly stated, "[recoupment] was limited to a showing of payment, or of former recovery."[16] Recoupment, "in its original sense, was a mere right of deduction."[17]

However, by the late 19th century, the defense of recoupment was expanded to "allow a defendant to show for the purpose of reducing the plaintiff's recovery any facts arising out of the transaction sued upon or connected with the subject thereof, which facts might have founded an independent action in favor of the defendant against the plaintiff."[18] To properly raise a defense of recoupment,

> [i]t [is] not necessary that the opposing claims be liquidated, nor that they be of the same character; i. e., a claim in "tort" [can] be set off against one in "contract." It [is] essential, however, that the claims of both plaintiff and defendant involve the same "subject-matter," or arise out

---

[14] Waterman, *supra* note 10, ch. X, § 416 at 466. See, *In re B & L Oil Co.*, 782 F.2d 155, 157 (10th Cir. 1986) ("[r]ecoupment originated as an equitable rule of joinder"); *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984) ("in the era of common law pleading, . . . the scope of a 'case' was far less inclusive than it is today, and . . . claim joinder was far narrower"). See, also, *Coplay Cement Co., Inc. v. Willis & Paul Group*, 983 F.2d 1435, 1440 (7th Cir. 1993) ("recoupment is the ancestor of the compulsory counterclaim . . . and setoff of the permissive counterclaim"). Cf. Neb. Ct. R. Pldg. § 6-1113(b) (rev. 2025). See *Boone River v. Miles*, 314 Neb. 889, 994 N.W.2d 35 (2023), *modified on denial of rehearing* 315 Neb. 413, 996 N.W.2d 629.

[15] Waterman, *supra* note 10, ch. X, § 415 at 466.

[16] Clark, *supra* note 10, ch. 10, § 98 at 437. Cf. *Exeter Nat. Bank v. Orchard*, 39 Neb. 485, 58 N.W. 144 (1894) (defense of payment not barred by statute of limitations).

[17] Sedgwick, *supra* note 10, ch. XVII at 496. See Waterman, *supra* note 10.

[18] Clark, *supra* note 10, ch. 10, § 98 at 437. Cf., e.g., *Musgrove v. Eskilsen*, 127 Neb. 730, 256 N.W. 883 (1934) (holding mortgagor may recoup damages for false representations and citing cases). See, generally, Sedgwick, *supra* note 10.

of the "same transaction," and that they be susceptible of adjustment in the same action.[19]

#### (b) Legal Principles of Recoupment

[3,4] Recoupment is, in effect, a defense of reduction.[20] "Recoupment" differs from "set-off" in this respect: Any claim or demand the defendant may have against the plaintiff may be used as a setoff, but it is not a subject for recoupment unless it grows out of the very same transaction that furnishes the plaintiff's cause of action.[21] Likewise, recoupment is distinguished from a counterclaim, as a counterclaim seeks an affirmative judgment and need not arise out of the same transaction or occurrence that is the basis of a plaintiff's action.[22] Recoupment is merely defensive in that it does not seek an affirmative judgment in the action.[23]

[5] Recoupment is an affirmative defense. The burden of both pleading and proving affirmative defenses is upon the defendants, and when they fail to do so, they cannot recover upon mere argument alone.[24] Recoupment is no exception. To state an affirmative defense of recoupment, the defendant must

---

[19] Clark, *supra* note 10, ch. 10, § 98 at 438. See *Stow v. Yarwood*, 14 Ill. 424 (1853). See, generally, 80 C.J.S. *Set-off and Counterclaim* § 38 (2022) (requirement that recoupment arise out of same transaction); 20 Am. Jur. 2d *Counterclaim, Recoupment, Etc.* § 38 (2015) (determination of same transaction).

[20] See, *Mobil Oil Corp. v. Grantham*, 200 Neb. 782, 265 N.W.2d 669 (1978); *Mettlen v. Sandoz*, 131 Neb. 625, 269 N.W. 98 (1936).

[21] See *In re Estate of Massie*, 218 Neb. 103, 109, 353 N.W.2d 735, 740 (1984) (internal quotation marks omitted) (quoting Black's Law Dictionary (4th ed. 1957)), *disapproved on other grounds, In re Estate of Price*, 223 Neb. 12, 388 N.W.2d 72 (1986). See, also, *Oft v. Dornacker*, 131 Neb. 644, 269 N.W. 418 (1936) (holding defendant's payment to plaintiff for repair of property did not grow out of annuity agreement for real property).

[22] *Ed Miller & Sons, Inc. v. Earl*, 243 Neb. 708, 502 N.W.2d 444 (1993).

[23] See, *Nathan v. McDermott*, 306 Neb. 216, 945 N.W.2d 92 (2020); *Ed Miller & Sons, Inc. v. Earl, supra* note 22.

[24] *Nathan v. McDermott, supra* note 23.

prove the elements of the claim and that it occurred in the very same action as the plaintiff's claim against the defendant.[25]

[6,7] The defense of recoupment is not barred by a statute of limitations.[26] As we have long recognized:

> [Even] if the statute of limitations had been properly pleaded, the plea could, under no circumstances, do more than defeat the [opposing party's] claim and bar affirmative relief; it could in no manner affect [a party's] right to act defensively and . . . show that [the opposing party's] claim . . . is unfounded. The right to commence and prosecute an action may be lost by delay, but the right to defend against a suit . . . is never outlawed. The limitation law may . . . deprive a suitor of his [or her] sword, but of his [or her] shield never.[27]

The defense of recoupment must arise out of the same transaction or occurrence as the plaintiff's cause of action, and it survives as long as the plaintiff's cause of action exists, even if affirmative legal action upon the subject of recoupment is barred by the statute of limitations.[28]

---

[25] *Id.*

[26] *Ed Miller & Sons, Inc. v. Earl, supra* note 22. See, *Katskee v. Nevada Bob's Golf of Neb.*, 238 Neb. 654, 472 N.W.2d 372 (1991); *Kaup v. Schinstock*, 88 Neb. 95, 129 N.W. 184 (1910).

[27] *Pinkham v. Pinkham*, 61 Neb. 336, 337-38, 85 N.W. 285, 285 (1901). See *Kaup v. Schinstock, supra* note 26 (holding plaintiff's action for damages barred, but recoupment not barred in future action by defendant). See, also, *Warner v. Sullivan*, 249 Mich. 469, 471, 229 N.W. 484, 485 (1930) ("plaintiff will not be permitted to insist upon the statute of limitations as a bar to such a defense when he [or she] is seeking to enforce payment of that which is due him [or her] under the contract out of which the defendant's claim for recoupment arises"); *State ex rel. American Etc. Mtg. Co. v. Tanner*, 45 Wash. 348, 357, 88 P. 321, 323 (1907) ("[i]t is actions themselves which are barred by statutes of limitation, and not matters of pure defense to such actions").

[28] See, *Nathan v. McDermott, supra* note 23; *Becker v. Hobbs*, 256 Neb. 432, 590 N.W.2d 360 (1999); *Nathan v. McKernan*, 170 Neb. 1, 101 N.W.2d 756 (1960); *Oft v. Dornacker, supra* note 21; *Mettlen v. Sandoz, supra* note 20.

### (c) Abram's Recoupment Defense

Before addressing the parties' arguments on appeal, we address two points of the district court's reasoning in reaching its conclusion that Abram's asserted defense of recoupment did not satisfy the same transaction test. First is the court's emphasis that Abram's defense of recoupment needed to arise out of the "**very**" same transaction. In *In re Estate of Massie*,[29] we quoted the definition of "recoupment" from Black's Law Dictionary,[30] for the proposition that "'any claim or demand . . . is not a subject for recoupment unless it grows out of the very same transaction which furnishes the plaintiff's cause of action.'" We note that in that context, "very" is an adjective and does not indicate a narrow construction of "same transaction."[31] Simply, as we have long held, the defense of recoupment needs to arise "'out of the same transaction as [the] claim.'"[32] We also note that "very" does not appear in the definition of "recoupment" within the latest edition of Black's Law Dictionary.[33]

The second is the court's reliance on two cases from the U.S. Courts of Appeals[34] in support of its conclusion that "[t]he mere fact that there was an ongoing contractual relationship [was] insufficient to meet the same transaction requirement of recoupment." We disagree that those cases are applicable to the instant case.

---

[29] *In re Estate of Massie, supra* note 21, 218 Neb. at 109, 353 N.W.2d at 740.

[30] Black's Law Dictionary, *supra* note 21.

[31] See Merriam-Webster's Collegiate Dictionary 1309 (10th ed. 2001) (defining adjective "very" as "being the same one" and adverb "very" as "to a high degree").

[32] *In re Estate of Massie, supra* note 21, 218 Neb. at 109, 353 N.W.2d at 740 (emphasis omitted) (citing *Nathan v. McKernan, supra* note 28; *Oft v. Dornacker, supra* note 21; and *Mettlen v. Sandoz, supra* note 20).

[33] Compare Black's Law Dictionary, *supra* note 21, with Black's Law Dictionary (12th ed. 2024).

[34] See, *U.S. on behalf of Postal Serv. v. Dewey Freight, supra* note 4; *In re University Medical Center, supra* note 4.

In *In re University Medical Center*,[35] the issue before the Third Circuit concerned the overpayment of Medicare reimbursements to a hospital. In that case, the court concluded that "the open-ended standard, endorsed in the context of discerning compulsory counterclaims, is inadequate for determining whether two claims arise from the same transaction for the purposes of equitable recoupment *in bankruptcy*."[36] It stressed its precedent that "both setoff and recoupment play very different roles *in bankruptcy* than in their original roles *as rules of pleading*."[37] For that reason, "a mere logical relationship [between the claims] is not enough."[38] Relevant there, the court observed that the Bankruptcy Code called for the "[u]se of [a] stricter standard."[39] It went on to conclude that because the Medicare Act and related regulations establish that the reconciliation process operates on an annual basis, overpayments in 1985 were not the same transaction as overpayments in 1988. Quoting the trial court, it explained: "'The [health care provider agreement at issue] is *a unique type* of contract. It does not provide for a defined transaction or even a series of transactions. It *simply establishes a relationship* between the parties[.]'"[40]

The Eighth Circuit considered a similar appeal in *U.S. on behalf of Postal Serv. v. Dewey Freight*.[41] The circuit court noted that the recoupment claim at issue "stem[med] from [the d]ebtor's failure to perform its *future* contractual commitments."[42] It ultimately concluded that the Bankruptcy Code foreclosed the creditor from "reduc[ing] the amount

---

[35] *In re University Medical Center, supra* note 4.

[36] *Id.*, 973 F.2d at 1081 (emphasis supplied).

[37] *Id.* (emphasis supplied).

[38] *Id.*

[39] *Id.*

[40] *Id.* (emphasis supplied).

[41] *U.S. on behalf of Postal Serv. v. Dewey Freight, supra* note 4.

[42] *Id.*, 31 F.3d at 623 (emphasis in original).

it owe[d] to [the d]ebtor for post-petition services by offsetting claims that [the Bankruptcy Code] has explicitly removed from the post-petition scene."[43]

Unlike those cases, the instant case does not involve either the Bankruptcy Code or a unique type of contract. As those cases observe, recoupment has distinct characteristics in the context of bankruptcy. Those distinctions are not present in general civil actions under Nebraska law, and the stricter standard applicable in bankruptcy cases is inapplicable here.

On appeal, Abram argues that the district court erred in finding that the amounts paid to Howard after the sale of Park Place in 2007 were part of a separate transaction from the amounts advanced between 2008 and 2016 that Howard seeks to collect in the instant action. Abram reasons that if Howard received an overpayment on the note in 2007, Abram had a positive balance on the note when Howard began making further advances on it in 2008, rather than no balance as Howard maintains. Abram contends that it is entitled to recoup the amount overpaid to Howard as principal and interest because "all payments and advances must be considered in accounting for a line of credit."[44] Abram maintains that all advances and payments on the promissory note constitute one transaction.

Conversely, Howard argues that the parties conducted two transactions: the advances that Abram used for Park Place and the advances that Abram used for the Pennsylvania properties. He asserts that "[a] comparison of the attributes of [the] loans shows clearly two separate transactions."[45] Howard contends that there were "two separate real estate deals" because the purpose of Abram's receipt of the advances was funding for different properties, and therefore, there were two

_____

[43] *Id.* at 625.

[44] Brief for appellant at 14.

[45] Brief for appellee at 23.

separate transactions.[46] In doing so, Howard misconstrues the focus of the "same transaction" inquiry.

[8] The focus of the single transaction inquiry in this case is not whether Howard's advances to support Abram's holding of Park Place constitute the same transaction as his advances to support Abram's holding of the Pennsylvania properties. The single transaction inquiry is not concerned with the purpose for the advances or Abram's use of the funds. The "same transaction" inquiry concerns whether the parties' claims arise from the same transaction between the parties. Abram's separate business transactions do not affect the transaction between Howard as the lender and Abram as the borrower. The applicable question is whether Abram's alleged overpayment on the promissory note arises out of the same transaction as the outstanding balance on the promissory note.

Howard's cause of action only seeks payment of advances he made to Abram between 2008 and 2016. However, as the parties stipulated, Howard made these advances under the promissory note. Howard also acknowledges in his appellate brief that in 2008, he "began advancing money to Abram *under the line of credit*."[47] As the district court found, based on the parties' pleadings and stipulations, Howard and Abram entered into an agreement on a single note, and all advances from 2004 to 2016 were under that note.[48] Howard, as the lender, and Abram, as the borrower, conducted a single transaction, the establishment and maintenance of an open line of credit.

Howard's cause of action is for the amount outstanding on the promissory note, and Abram disputes the amount Howard claims is outstanding. Howard claims there was no balance on the note when he made the advances for which he seeks

---

[46] *Id.*

[47] *Id.* at 22 (emphasis supplied).

[48] See, e.g., *Nathan v. McDermott, supra* note 23 (judicial admission is waiver of all controversy and limitation of issues); *Barkalow Bros. Co. v. English*, 159 Neb. 407, 67 N.W.2d 336 (1954) (same).

to recover, while Abram claims that there was a positive balance on the note. In defense of Howard's claim, Abram seeks to reduce Howard's recovery by showing that it made a payment on its debt prior to the 2008 advances that is unaccounted for in Howard's claim. The payment would serve as a deduction from the outstanding balance owed to Howard on the note. Moreover, Abram's defense of recoupment for the alleged overpayment was not available to Abram until Howard demanded payment of the outstanding balance that he alleged.[49] Abram's attempt to reduce Howard's recovery is a quintessential example of the early limited application of the defense of recoupment, as it seeks to enforce its right of deduction by showing a prior payment, which is the defense of recoupment in its original sense.

Abram's defense of recoupment for an overpayment of the outstanding balance on the promissory note in 2007 arises from the "same transaction" as Howard's claim for payment of the outstanding balance on the promissory note. The transaction is the promissory note. The seller's statement plainly shows that the closing on Park Place included an amount to "Pay[ ]off Howard['s] lien." Whether that amount exceeded the amount due on the note when Abram paid Howard directly affects the outstanding balance due on the note at the time Howard filed his complaint. There is a dispute of material fact, and the court erred in granting summary judgment on Abram's defense of recoupment related to the payment from the sale of Park Place to Howard for the "lien."

However, to the extent Abram has not abandoned its defense of recoupment concerning the amount of funds Howard received as repayment on a personal loan with Helen Misle, Abram conflates Howard as the lender and Howard as the former manager of Abram. The transaction of any personal loan between Howard and Helen Misle is

_____

[49] See *Mettlen v. Sandoz, supra* note 20. See, also, *Susman v. Kearney Towing & Repair Ctr.*, 310 Neb. 910, 970 N.W.2d 82 (2022).

not related to the promissory note—the subject of Howard's cause of action. The court did not err in granting summary judgment in favor of Howard on Abram's defense of recoupment as it relates to Howard's self-reimbursement for the personal loan. Nevertheless, this issue was properly asserted as it relates to Abram's counterclaims for breach of fiduciary duty and fraudulent concealment, which we address in the next section.

Because the cause must be remanded, there is one final issue to address related to Abram's defense of recoupment as to the alleged overpayment after the sale of Park Place. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.[50]

The appellate record shows that there was much discussion had in the proceedings below as to whether a defense of recoupment is an equitable defense that should be tried to the bench, instead of to a jury. As indicated in our discussion above of the development of recoupment, recoupment is a rule of pleading and merely equitable insofar as it allows consideration of an issue that would otherwise not be considered as part of the plaintiff's cause of action.[51] In this case, Abram's defense of recoupment does not raise an independent claim or seek equitable relief. It solely concerns the balance of the note as part of Howard's cause of action.

## 2. Limitations Period of Abram's Counterclaims

As mentioned above, due to our resolution concerning Abram's recoupment defense as to the amount paid on the promissory note from the sale of Park Place, Abram's two

---

[50] *Brush & Co. v. W. O. Zangger & Son*, 314 Neb. 509, 991 N.W.2d 294 (2023).

[51] See, also, *Stow v. Yarwood, supra* note 19 (holding two claims arising out of same subject matter may properly be investigated and adjusted in one action).

alternative theories of recovery under its counterclaims are only applicable to its alleged damages caused by Howard's self-reimbursement for a personal loan to Helen Misle. There is no dispute that these claims are governed by the 4-year statute of limitations found in Neb. Rev. Stat. § 25-207(3) and (4) (Reissue 2016). There is also no dispute that Abram asserted these claims more than 4 years after Howard's self-reimbursement from the sale of Park Place.

However, Abram contends that the discovery rule applies to the 4-year statute of limitations for each of its counterclaims.[52] We address them in turn.

### (a) Discovery Rule Principles

The general rule is that a claim accrues and the statute of limitations begins to run when the aggrieved party has the right to institute and maintain suit.[53] A party is not aggrieved and cannot institute and maintain suit if any element of that party's claim depends upon abstract questions or issues that might arise in a hypothetical or fictitious situation or setting and may never come to pass.[54] The essential attribute of a statute of limitations is that it accords and limits a reasonable time within which a suit may be brought upon causes of action which it affects.[55] The mischief which statutes of limitations are intended to remedy is the general inconvenience resulting from delay in the assertion of a legal right which is practicable to assert.[56] However, if an injured party is wholly unaware of the nature of an injury or the cause of it, it is

---

[52] See § 25-207.

[53] *Spath v. Morrow*, 174 Neb. 38, 115 N.W.2d 581 (1962). See *Susman v. Kearney Towing & Repair Ctr., supra* note 49.

[54] *Susman v. Kearney Towing & Repair Ctr., supra* note 49.

[55] *Id.*

[56] *Id.* See, *Shlien v. Board of Regents*, 263 Neb. 465, 640 N.W.2d 643 (2002); *Condon v. A. H. Robins Co.*, 217 Neb. 60, 349 N.W.2d 622 (1984); *Spath v. Morrow, supra* note 53.

difficult to see how the party may be charged with a lack of diligence or sleeping on its rights.[57] Accordingly, Nebraska has adopted the "discovery rule," which provides an exception to a statute of limitations for a claim that would otherwise be outside the statutory period.[58]

Under Nebraska law, there are several different discovery rules that pertain to various types of actions. For example, a number of discovery rules are statutory, such as in the instance of "an action for relief on the ground of fraud,"[59] actions concerning professional negligence or breach of warranty of professional services,[60] and actions concerning breach of warranty or defects related to improvements to real property.[61] In addition, we have judicially recognized discovery rules for other claims, unless the statutory provisions are to the contrary.[62]

Though the differences between the various discovery rules may be slight, it is necessary that the bench and bar ensure

---

[57] See, *Shlien v. Board of Regents, supra* note 56; *Condon v. A. H. Robins Co., supra* note 56; *Spath v. Morrow, supra* note 53.

[58] See, *Alston v. Hormel Foods Corp.*, 273 Neb. 422, 730 N.W.2d 376 (2007); *Sacchi v. Blodig*, 215 Neb. 817, 341 N.W.2d 326 (1983). See, also, *Spath v. Morrow, supra* note 53.

[59] § 25-207(4).

[60] See Neb. Rev. Stat. § 25-222 (Reissue 2016). See, also, *Nuss v. Alexander*, 269 Neb. 101, 691 N.W.2d 94 (2005).

[61] See Neb. Rev. Stat. § 25-223 (Cum. Supp. 2024).

[62] Compare *Shlien v. Board of Regents, supra* note 56 (discovery rule applicable to State Tort Claims Act); *Hutmacher v. City of Mead*, 230 Neb. 78, 430 N.W.2d 276 (1988) (discovery rule applicable to Political Subdivisions Tort Claims Act); *Condon v. A. H. Robins Co., supra* note 56 (discovery rule applicable to Neb. Rev. Stat. § 25-224 (Reissue 2016) concerning product liability actions); and *Spath v. Morrow, supra* note 53 (discovery rule applicable to medical malpractice actions), with *Mandolfo v. Mandolfo*, 281 Neb. 443, 796 N.W.2d 603 (2011) (discovery rule inapplicable to claims under Neb. U.C.C. § 3-420 (Reissue 2020)). See, generally, John P. Lenich, Nebraska Civil Procedure, § 5:27 (2025).

that the proper discovery rule is applied in any given case.[63] In this case, a different discovery rule applies to each of Abram's counterclaims. Abram's claim for breach of fiduciary duty is subject to the 4-year statute of limitations and our judicial discovery rule under § 25-207(3), and Abram's claim for fraudulent concealment is based on fraud and, thus, is controlled by § 25-207(4). We address each in turn.

### (b) Breach of Fiduciary Duty

[9,10] When the discovery rule is applicable, the running of the statute of limitations is tolled until the discovery of the cause of action.[64] "'Discovery of a cause of action'" occurs when there is knowledge of facts constituting the basis of the cause of action or awareness of the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry, which, if pursued, would lead to the discovery of the cause of action.[65] The cause of action in any case embraces not only the injury which the complaining party has received, but it includes more.[66] All the facts which, taken together, are necessary to fix the responsibility are parts of the cause of action.[67]

[11] We have long recognized that the question as to a plaintiff's knowledge of the facts which should have put a person of ordinary intelligence and prudence on notice is a question of fact.[68] Accordingly, the point at which a statute

---

[63] Cf. *Rosnick v. Marks*, 218 Neb. 499, 357 N.W.2d 186 (1984). See, generally, Lenich, *supra* note 62.

[64] See *Alston v. Hormel Foods Corp., supra* note 58. See, also, *Colwell v. Mullen*, 301 Neb. 408, 918 N.W.2d 858 (2018); *Behrens v. Blunk*, 284 Neb. 454, 822 N.W.2d 344 (2012).

[65] E.g., *Gering – Ft. Laramie Irr. Dist. v. Baker*, 259 Neb. 840, 846, 612 N.W.2d 897, 903 (2000).

[66] *Christensen v. Broken Bow Public Schools*, 312 Neb. 814, 981 N.W.2d 234 (2022).

[67] *Susman v. Kearney Towing & Repair Ctr., supra* note 49.

[68] *Vrbsky v. Arendt, supra* note 8.

of limitations begins to run must be determined from the facts of each case, and, in an action at law, the decision of the fact finder will not be set aside by an appellate court unless clearly wrong.[69]

In this case, the district court found that Marsha, Linda, and the accountant were agents of Abram and imputed their knowledge of facts concerning Howard's reimbursement from the sale proceeds of Park Place to Abram. As a result, the court found that Abram had knowledge of the facts which should have put a person of ordinary intelligence and prudence on notice at the time of the sale of Park Place. Before addressing whether Abram discovered its cause of action, we first review our principles of agency.

*(i) Agency Principles*

[12] An "agent" is a person authorized by the principal to act on the principal's behalf and under the principal's control.[70] However, an independent contractor is one who, in the course of an independent occupation or employment, undertakes work subject to the will or control of the person for whom the work is done only as to the result of the work and not as to the methods or means used.[71] The determination of whether one is an independent contractor or an agent is one of fact.[72]

The common-law test for determining whether an independent contractor status exists includes the consideration and weighing of many factors, no one of which is conclusive.[73]

---

[69] See, e.g., *Zook v. Zook, supra* note 8; *Guinn v. Murray, supra* note 8; *Vrbsky v. Arendt, supra* note 8.

[70] *RM Campbell Indus. v. Midwest Renewable Energy*, 294 Neb. 326, 886 N.W.2d 240 (2016); *Koricic v. Beverly Enters. – Neb.*, 278 Neb. 713, 773 N.W.2d 145 (2009); *McCurry v. School Dist. of Valley*, 242 Neb. 504, 496 N.W.2d 433 (1993).

[71] *Sparks v. M&D Trucking*, 301 Neb. 977, 921 N.W.2d 110 (2018); *McCurry v. School Dist. of Valley, supra* note 70.

[72] *McCurry v. School Dist. of Valley, supra* note 70.

[73] *Id.*

The criteria for making the determination include a consideration of who has the right of control, who provided the tools, the degree of supervision exerted over the one performing the work, the method of payment, and the contractual understanding between the parties.[74] Moreover, whether an agency relationship exists between two parties depends on the facts underlying the association, irrespective of how the parties describe or characterize their connection.[75] Moreover, an agency may be implied from the words and conduct of the parties and the circumstances of the particular case that evidence an intention to create the relationship.[76]

[13] As a general rule, the knowledge of an agent is imputed to the principal.[77] If knowledge, as distinguished from reason to know, is the important element in a transaction, and the agent who has the knowledge is not one acting for the principal in the transaction, the principal is not affected by the fact that the agent has the knowledge.[78] In many situations, in order for one to be responsible, it is necessary that the act be done with knowledge in a subjective sense, and it is not sufficient that one has the means of information.[79]

It is the duty of an agent to communicate to the principal all the facts concerning the service in which the agent is engaged that come to the agent's knowledge in the course of the agent's employment, and this duty, in a subsequent action between the principal and a third person, the agent is conclusively presumed to have performed.[80] This is the foundation of

---

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Exchange Bank of Wilcox v. Nebraska Underwriters Ins. Co.*, 84 Neb. 110, 120 N.W. 1010 (1909). See *Scottsbluff Nat. Bank v. Blue J Feeds, Inc.*, 156 Neb. 65, 54 N.W.2d 392 (1952).

[78] *Nebraska Pub. Emp. v. Otoe Cty.*, 257 Neb. 50, 595 N.W.2d 237 (1999).

[79] See *id.*

[80] *Id.*

the doctrine that notice to an agent is notice to the principal.[81] Notice to the agent is notice to the principal, where such notice is received by the agent while acting within the scope of the agent's authority.[82] A principal may limit or restrict the powers of its agent, and, when such restrictions are known to the person dealing with the agent, the principal is only bound by the acts of the agent performed within the scope of the authority conferred.[83] In the case of an officer or agent of a private corporation dealing with its funds, the authority of such officer or agent is not known to all but depends upon the authority conferred by the corporation which the officer or agent represents.[84]

### (ii) Knowledge of Abram's Agents

[14,15] Generally, whether an agency relationship exists and the scope of an agent's authority present questions of fact.[85] In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.[86]

### a. Marsha

The district court found that Marsha was an agent of Abram because she was the trustee of the Misle Trust. This finding is clearly wrong.

[16,17] Marsha was never authorized by Abram to act on its behalf or under its control. As a general rule, two separate

---

[81] *Nebraska Pub. Emp. v. Otoe Cty., supra* note 78; *Equilease Corp. v. Neff Towing Serv.*, 227 Neb. 523, 418 N.W.2d 754 (1988).

[82] See, *Robbins v. National Life & Acc. Ins. Co.*, 182 Neb. 749, 157 N.W.2d 188 (1968); *Arendt v. North American Life Ins. Co.*, 107 Neb. 716, 187 N.W. 65 (1922).

[83] See *German Ins. Co. v. Heiduk*, 30 Neb. 288, 46 N.W. 481 (1890).

[84] *Blue J Feeds, Inc. v. Scottsbluff Nat. Bank*, 156 Neb. 84, 54 N.W.2d 404 (1952); *Scottsbluff Nat. Bank v. Blue J Feeds, Inc., supra* note 77.

[85] See *Koricic v. Beverly Enters. - Neb., supra* note 70.

[86] *Koricic v. Beverly Enters. - Neb., supra* note 70.

corporations are regarded as distinct legal entities even if the stock of one is owned wholly or partly by the other.[87] We disagree with the court's theory of agency law that it found to impute knowledge to a subsidiary limited-liability company through the trustee of the parent entity. We have long recognized that notice of facts will be imputed only to the principal for whom and in whose interest an agent acted at the time.[88] What Marsha knew about Howard's self-reimbursement for the personal loan to Helen Misle was not relevant to whether Abram knew or should have known of the cause of action for breach of fiduciary duty. Even though Marsha was the trustee of the trust that owned Abram, neither the trust nor Marsha was ever an agent of Abram.

b. Linda

The district court also found that Linda was an agent of Abram. As manager of Abram from 2010 throughout this action, it cannot be disputed that Linda was an agent of Abram. Thus, Linda's knowledge is imputed to Abram. The question then is whether Linda had knowledge of facts constituting the basis of the cause of action or awareness of the existence of sufficient facts that would have led to the discovery of the cause of action.

The court found that Linda was aware of sufficient facts because she considered filing suit against Howard for his "mismanagement" of the Pennsylvania properties and his decision to purchase those properties in lieu of the discount store "in Scottsdale." This finding is clearly wrong.

[18] Plaintiffs, including cross-plaintiffs, are bound by their knowledge as to *specific facts* occurring in *specific*

---

[87] See *Roos v. KFS BD, Inc.*, 280 Neb. 930, 799 N.W.2d 43 (2010). Accord *Bacon v. DBI/SALA*, 284 Neb. 579, 822 N.W.2d 14 (2012).

[88] See, also, *State, ex rel. Davis, v. Farmers & Merchants Bank*, 112 Neb. 840, 201 N.W. 897 (1924).

*timeframes*.[89] As one Nebraska law scholar succinctly states, "Just because the plaintiff may be in possession of information from which its cause of action could have been discovered does not necessarily mean that the plaintiff could have reasonably discovered its cause of action."[90]

When Linda assumed the role of manager of Abram in 2010, Abram's business consisted of the Pennsylvania properties. The evidence shows that Howard decided to purchase the Pennsylvania properties instead of the discount store "in Scottsdale" and that the properties were suffering from a lack of tenants and were not profitable. Howard's decision to purchase the Pennsylvania properties and his subsequent management of those properties are removed from the distribution of funds from the sale of Park Place. The distribution of funds from the closing of Park Place would not have been relevant to Linda's lawsuit.

Our decision in *Norfolk Iron & Metal v. Behnke*[91] is instructive. In that case, the plaintiff company brought suit against an accountant who prepared monthly unaudited statements and annual audits of a company the plaintiff purchased. The next year's annual audit revealed a shortage of the company's scrap metal inventory of "about 344 railroad carloads," which amounted to "somewhere in the neighborhood of 75 percent of [the company's] total stated inventory."[92] The plaintiff's president testified that "'[i]t was [his] feeling'" that there was an inventory shortage when the purchase of the company closed, which was confirmed by the next year's audit.[93] We held that the plaintiff's discovery of its cause of action was made

---

[89] See *Kelly Klosure v. Johnson Grant & Co.*, 229 Neb. 369, 427 N.W.2d 44 (1988).

[90] Lenich, *supra* note 62, § 5:28 at 266-67 (citing cases).

[91] *Norfolk Iron & Metal v. Behnke*, 230 Neb. 414, 432 N.W.2d 18 (1988).

[92] *Id.* at 416, 432 N.W.2d at 20.

[93] *Id.* at 422, 432 N.W.2d at 23.

"when [the president] first had a feeling that the inventory was short," and not after the annual audit.[94]

The plaintiff had argued that another certified public accountant needed to have done a physical inventory in order to discover the shortage. However, we noted that the president felt that the inventory was short and that he was able to go through the yard, observe the scrap metal inventory, and estimate the inventory to confirm his feeling. We recognized that the president may not have been capable of discovering the exact extent of the shortage, but since the shortage amounted to 75 percent of the company's recorded inventory and 344 railroad carloads of scrap metal, the president was capable of ascertaining for himself that a shortage existed.

[19] *Norfolk Iron & Metal v. Behnke* presented an extreme factual scenario that is quite different from the factual scenario in the instant case. But that case illustrates the relationship between the cause of action and knowledge of the specific facts required to discover a claim. Discovery does not occur until there is at least an awareness of the existence of specific facts, which, if pursued, would have led to the discovery of the specific cause of action. The record shows that Linda had no such awareness.

### c. Abram's Accountant

Finally, the district court found that Abram's accountant was an agent of Abram and had full knowledge of Abram's claims. The court found that the accountant had "clear and complete knowledge of the amounts Howard was paid" from the sale of Park Place and that he therefore had knowledge of Abram's claims in 2007. The court then imputed such knowledge to Abram. This finding is clearly wrong.

[20,21] As set forth above, notice to the agent is notice to the principal only when the agent is acting within the scope of its authority, and an agent's powers may be limited or

---

[94] *Id.* at 425, 432 N.W.2d at 25.

restricted.[95] In the case of an officer or agent of a private corporation dealing with its funds, the authority of such officer or agent is not known to all but depends upon the authority conferred upon the officer or agent by the corporation which he or she represents.[96]

Here, assuming that the accountant was an agent of Abram, the accountant was not a "general" agent. The scope of the accountant's duties was limited to those actions directed by Howard as the manager of Abram. It was outside the scope of the accountant's duties to audit the amount of funds that Howard advanced and was reimbursed. Even though the accountant knew the amount of money that Howard received from the sale of Park Place, he had never received a copy of the promissory note. There is nothing that suggests that the accountant should have been aware of any wrongdoing by Howard.

### (iii) Statute of Limitations Was Tolled

There is no evidence in the record that Abram discovered its cause of action for Howard's breach of fiduciary duty until it received copies of the 2004 promissory note between Howard and Abram and the 2007 "seller's statement" prepared by the accountant after the sale of Park Place. Accordingly, the statute of limitations was tolled and Abram timely raised its counterclaim.

### (c) Fraudulent Concealment

[22] The statute of limitations for Abram's claim for fraudulent concealment is found in § 25-207(4), which provides that the 4-year limitations period applies to "an action for relief on the ground of fraud, but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud." Under this section, the statute of limitations is

---

[95] See *Nebraska Pub. Emp. v. Otoe Cty., supra* note 78.

[96] *Blue J Feeds, Inc. v. Scottsbluff Nat. Bank, supra* note 84; *Scottsbluff Nat. Bank v. Blue J Feeds, Inc., supra* note 77.

not tolled. Instead, the accrual of the cause of action does not occur until the fraud is discovered.

In order to successfully assert the doctrine of fraudulent concealment and thus estop the defendant from claiming a statute of limitations defense, the plaintiff must show the defendant has, either by deception or by a violation of a duty, concealed from the plaintiff material facts which prevented the plaintiff from discovering the cause of action.[97] Under the doctrine of fraudulent concealment, the plaintiff must show that he or she exercised due diligence to discover his or her cause of action before the statute of limitations expired.[98] Allegations of fraudulent concealment for tolling purposes must be pleaded with particularity.[99]

[23] The district court found that Abram failed to show that Howard concealed any material facts from Abram or that Abram exercised due diligence to discover the cause of action. However, Abram did not provide an argument in its appellate brief addressing these findings of the court. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party assigning the error.[100] Accordingly, we do not consider whether the court erred in these findings.

### 3. INTEREST CALCULATION

Abram argues that the district court erred in adopting Howard's interest calculation without providing Abram with an opportunity to challenge the calculation after the court had denied summary judgment on the issue. Specifically, Abram seeks to challenge the applicability of interest to at least some of the advances, because Linda was not aware

---

[97] See *Chafin v. Wisconsin Province of Society of Jesus*, 301 Neb. 94, 917 N.W.2d 821 (2018).

[98] *Id.*

[99] *Id.*

[100] *Uhrich & Brown Ltd. Part. v. Middle Republican NRD*, 315 Neb. 596, 998 N.W.2d 41 (2023).

that the advances were subject to interest, and to challenge the use of compound interest to calculate the amount of interest owed.

As mentioned above, based on the parties' pleadings and stipulations, the court found that all of the advances were under the promissory note. The promissory note provides that loans are subject to a 3-percent per annum interest rate. We find no merit to Abram's contention that it should be able to challenge the applicability of interest.

However, we agree that a dispute remains as to whether the promissory note's "per annum" 3-percent interest rate refers to compound or simple interest.[101] On remand, the parties should be given the opportunity to litigate the issue.[102]

## VI. CONCLUSION

On Abram's defense of recoupment, we affirm the grant of summary judgment as it relates to the alleged personal loan to Helen Misle and reverse the grant of summary judgment as it relates to Abram's alleged overpayment on the promissory note. On Abram's counterclaims, we affirm the court's judgment as it relates to Abram's claim of fraudulent concealment and reverse the judgment as it relates to Abram's claim of breach of fiduciary duty. Further, on remand, the parties should be given the opportunity to litigate whether the promissory note provides simple or compound interest.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

MILLER-LERMAN, J., not participating.

---

[101] See, also, *Lincoln Lumber Co. v. Fowler*, 248 Neb. 221, 533 N.W.2d 898 (1995); *Ashland State Bank v. Elkhorn Racquetball, Inc.*, 246 Neb. 411, 520 N.W.2d 189 (1994).

[102] See *McAllister v. McAllister*, 228 Neb. 314, 422 N.W.2d 345 (1988).